**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4584**

UNITED STATES OF AMERICA,

        Plaintiff – Appellee,

v.

TERESA BLANKENSHIP BARRINGER,

        Defendant – Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Abingdon.  James P. Jones, Senior District Judge.  (1:19-cr-00051-JPJ-PMS-1)

Argued:  December 7, 2021                  Decided:  February 2, 2022

Before, WILKINSON, NIEMEYER, and AGEE, Circuit Judges.

Affirmed by published opinion.  Judge Agee wrote the opinion, in which Judge Wilkinson and Judge Niemeyer joined.

**ARGUED:**  Gerald Thomas Zerkin, Richmond, Virginia, for Appellant.  Jennifer R. Bockhorst, OFFICE OF THE UNITED STATES ATTORNEY, Abingdon, Virginia, for Appellee.  **ON BRIEF:**  Daniel P. Bubar, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia, for Appellee.

AGEE, Circuit Judge:

Teresa Blankenship Barringer challenges her convictions and 36-month sentence for multiple counts of willful failure to collect or pay over taxes, in violation of 26 U.S.C. § 7202, and making materially false statements to federal agents, in violation of 18 U.S.C. § 1001. For the reasons set forth below, we affirm the judgment of the district court.

I.

A.

Barringer was the long-time Executive Vice President ("EVP") and a Board member of J&R Manufacturing, Inc. ("J&R"), a Virginia company that produced electrical connectors for coal mining equipment. Her responsibilities as EVP included managing J&R's accounting, payroll, sales, and accounts receivable, while her duties as a Board member included collecting and paying federal payroll taxes. Using Internal Revenue Service ("IRS") Form 941, these taxes are withheld from employees' paychecks and paid quarterly to the IRS along with a matching contribution from the employer (collectively, "941 taxes").

In late 2012, J&R began experiencing financial difficulties due to a downturn in the coal market, and, by 2014, it was delinquent on filing and paying its 941 taxes. Barringer subsequently received a letter from the IRS notifying her that she was civilly responsible for the delinquent taxes. Fearing that personal liability, Barringer sought to access her account in the company's 401(k) retirement plan, administered by AXA Equitable Insurance Company ("AXA"), as a source of funds from which to pay the 941 taxes.

2

Relevant here, to withdraw funds from a 401(k) plan before retirement age, the participant must be vested[1] and must establish that a distributable event has occurred. Reaching retirement or leaving employment is such a distributable event, as are certain types of hardship (as referenced in the Code of Federal Regulations), such as to prevent foreclosure on a primary residence.

In November 2014, Barringer faxed AXA a Hardship Withdrawal Request Form requesting $311,859.04 from her 401(k) plan account "[t]o prevent eviction from a principal residence or . . . a foreclosure of the mortgage on [her] principal residence" J.A. 144. Based on her representations, AXA approved the request, and Barringer deposited the funds into a J&R account to pay the delinquent 941 taxes and keep the company afloat, so that "[b]y 2015 . . . J&R [had] caught up on the 941 taxes." J.A. 354. The AXA withdrawal form contained the following warning:

> Any person who knowingly and with an intent to injure, defraud, or deceive any insurance company, files a statement of claim or an application containing false, incomplete, or misleading information may be guilty of a crime, which could result in imprisonment, fines, denial of insurance, and civil damages.

J.A. 115. Further, according to bank records, Barringer's mortgage balance was only approximately $200,000 when she withdrew the funds from her 401(k) account, she was on time with her payments, and she had not received any delinquent or foreclosure notices.

By 2016, J&R had again fallen behind on its 941 taxes. On September 2, 2016, Barringer requested from AXA a final distribution from her 401(k) account, citing the end

---

[1] Participants are always vested in their own funds, but become vested in their employer's matching funds after five years of employment.

3

of her employment with J&R on August 31, 2016, as the basis. AXA approved the request. When Barringer received the distribution, she again deposited the funds, along with some of her personal savings, into the J&R account in order to fund the company. But this time, although "there was money in the account that could have been paid to the IRS [for the delinquent 941 taxes, Barringer] chose to pay herself and other vendors [instead]." J.A. 281. Notwithstanding her representation to AXA, Barringer continued working for J&R until October 28, 2016, receiving benefits and payments from the company during that period.

On July 25, 2019, Barringer's attorneys met with agents of the IRS, Federal Bureau of Investigation, Virginia State Police, and attorneys from the United States Attorney's Office, all of whom were investigating potential financial crimes at J&R. Barringer joined the interview at the suggestion of one of her attorneys.[2] During the interview, "[i]t was explained to her she didn't have to be there, she didn't have to answer any questions, and that things she did say could be used against her." J.A. 208. On this last point, "[i]t was expressed to her at the beginning of the interview and at the end of the interview that it was very important that she was truthful to federal law enforcement, that it was a crime to lie to [the agents]." *Id.*

---

[2] The interview was neither recorded nor contemporaneously transcribed. Instead, an IRS investigator prepared a memorandum following the interview based on his recollection and the notes he and the other investigators took during the meeting.

During the interview, Barringer stated that her last day of employment at J&R was October 28, 2016, which was consistent with her claims in two civil cases.[3] However, later in the interview, Barringer changed her answer and asserted that she left J&R on August 31, 2016. Barringer also explained that she had tried to withdraw funds from her 401(k) account to pay the 941 taxes, but that AXA denied her request. After receiving this denial, she confirmed that she nonetheless submitted a withdrawal form to AXA, claiming that she needed the funds to prevent foreclosure because she feared she would be unable to pay her mortgage if J&R collapsed.

B.

A federal grand jury subsequently returned a nine-count indictment against Barringer for willfully failing to collect and truthfully account for and pay taxes, in violation of 26 U.S.C. § 7202 (Counts One through Four); wire fraud, in violation of 18 U.S.C. § 1343 (Counts Five and Six); and making materially false statements to federal agents, in violation of 18 U.S.C. § 1001(a)(2) (Counts Seven through Nine).

Barringer moved pretrial to dismiss the indictment. First, she requested dismissal of the tax charges in Counts One through Four on equal protection grounds, highlighting that the Government had charged her, but not Roy Riley, the owner of J&R. Next, she claimed the wire fraud charges in Counts Five and Six were insufficient as a matter of law because the relevant statute only targets schemes aimed at appropriating funds or property from

_____

[3] Barringer sued J&R and Roy Riley, the owner of the company, for repayment of the funds she deposited into J&R (from both her 401(k) account and personal savings), failure to pay wages, and recovery of her personal property at J&R's workplace.

5

others, and the funds at issue were hers alone. Finally, she argued that if the tax and wire fraud charges were dismissed, then the false statements alleged in Counts Seven through Nine by definition could not have been material to a matter within the Government's jurisdiction, as required by the relevant statute. The court denied the motion as to Counts One through Four, finding that "the motion d[id] not allege [a] sufficient factual basis" to support dismissal "on the ground of selective prosecution." J.A. 76. As for the remaining counts, it denied the motion without prejudice as premature.

After the Government successfully moved to dismiss Count One,[4] Barringer proceeded to trial on Counts Two through Nine. During opening statements, the prosecutor stated that the case was about "[t]axes, fraud, and lies." J.A. 86. Relevant here, Ron Vincek, AXA's senior director of 401(k) operations, testified. He explained that the withdrawal form requesting distribution due to end of employment (Barringer's second request in September 2016) required the employee and the plan sponsor to certify that the information was correct. The form requesting distribution for a hardship (Barringer's first request in November 2014) required a valid hardship, limited the withdrawal amount to the sum needed, and required approval by the "plan administrator or authorized person to act upon the administration of the plan." J.A. 115. On this point, Vincek indicated that reinvestment into a company was not a valid reason for a hardship withdrawal. He also noted that AXA would not approve a withdrawal request if the stated reason for the withdrawal did not

---

[4] The Government "decided to dismiss that charge because there actually were [tax] deposits made." J.A. 237.

satisfy IRS requirements and opined that failure to comply with those requirements could jeopardize the validity of J&R's entire 401(k) plan.

IRS Special Agent Trevor McMurray testified that J&R had unpaid taxes in the first three quarters of 2016, in the amounts of $78,161.09, $64,848.13, and $43,883.20, and that at Barringer's direction, J&R paid $96,159.83 in other bills without first paying off those balances. He did, however, note that the company paid off its outstanding tax balance in 2019, which post-dated Barringer's employment at J&R.[5]

Barringer also testified. She confirmed that she and the other Board members were responsible for paying the 941 taxes, and that she proposed using the 401(k) funds to pay the 941 taxes after receiving the IRS letter informing her of her civil liability. Relatedly, she testified that, in her mind, she did nothing wrong when she withdrew funds from her 401(k) account to pay the 941 taxes because she was using her own funds to save the company. And she did so because she believed that she would be unable to pay her mortgage if J&R collapsed. Barringer also testified that she contacted AXA in 2016 to inquire whether she could close her 401(k) account, but that AXA informed her she could only do so if she was no longer employed at J&R. She stated that she listed her last day of employment with J&R as August 31, 2016, in order to access the 401(k) funds, but that she intended to be rehired the following week. J.A. 363–64.[6]

---

[5] At the close of the Government's case-in-chief, Barringer renewed her pretrial motion to dismiss and moved for a judgment of acquittal. The district court denied both motions.

[6] At the close of all the evidence, Barringer again renewed her pretrial motion to dismiss and moved for a judgment of acquittal. The district court denied both motions.

7

During closing arguments, the prosecutor reiterated that the case was "about taxes, fraud, and lies," J.A. 540, and emphasized that Barringer's false statements on the 401(k) hardship withdrawal forms could have "endanger[ed] the validity of everyone's 401(k)," J.A. 541. The jury subsequently convicted Barringer on all counts.

She then moved for a new trial and for a judgment of acquittal, *see* Fed. R. Crim. P. 29, 33, reiterating the arguments she advanced in her pretrial motion to dismiss and raising several others. The court granted Barringer's motion for a judgment of acquittal as to the wire fraud charges in Counts Five and Six, finding that the Government had failed to prove that her "deceit deprived another of a property interest." J.A. 694. However, it denied her motion for a new trial on the other counts. The court also denied Barringer's subsequent motion to reconsider the denial of her posttrial motions.

C.

A Presentence Report ("PSR") was prepared, setting Barringer's base offense level at 16. *See* U.S.S.G. §§ 2T1.6(a), 2T4.1(F). It also applied a two-level enhancement because Barringer "abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. With a total offense level of 18 and a criminal history category of I, the PSR yielded an advisory Guidelines range of 27 to 33 months' imprisonment. Barringer objected to the abuse-of-trust enhancement, and the Government objected to the absence of an obstruction-of-justice enhancement, *see* U.S.S.G. § 3C1.1.

At sentencing, the court concluded that the abuse-of-trust enhancement was proper because Barringer held a position of trust as to the Government to collect and pay the 941

8

taxes. It also sustained the Government's objection and imposed a two-level enhancement for obstruction of justice, raising Barringer's total offense level to 20 and the advisory Guidelines range to 33 to 41 months' imprisonment.

The court sentenced Barringer to 36 months' imprisonment, and Barringer timely appealed. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

II.

On appeal, Barringer asserts that the district court erred by denying her motions to dismiss, for a new trial, and for a judgment of acquittal. She also raises a due process claim as to Vincek's testimony. Finding these arguments unpersuasive, we affirm the district court's judgment as to her convictions.

A.

Barringer first contests the district court's denial of her pretrial motion to dismiss the wire fraud and false statement counts. Specifically, she asserts that the wire fraud charges were deficient as a matter of law because her actions did not deprive another of a property interest and relatedly claims that the false statements were not material to a matter within the Government's jurisdiction, as required under the relevant statute. We disagree.

1.

"We review the district court's factual findings on a motion to dismiss an indictment for clear error, but . . . review its legal conclusions de novo." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (citation omitted). "When a criminal defendant challenges the sufficiency of an indictment prior to the verdict, . . . we apply a heightened scrutiny to

9

ensure that every essential element of an offense has been charged." *Id.* (citation omitted). "[A]n indictment must contain the elements of the offense charged, fairly inform a defendant of the charge, and enable the defendant to plead double jeopardy as a defense in a future prosecution for the same offense." *United States v. Kingrea*, 573 F.3d 186, 191 (4th Cir. 2009) (citation omitted). "[T]he indictment must also contain a statement of the essential facts constituting the offense charged[.]" *Perry*, 757 F.3d at 171 (citation omitted).

2.

To obtain a conviction for wire fraud, in violation of 18 U.S.C. § 1343, the Government must show that the defendant "(1) devised or intended to devise a scheme to defraud and (2) used the . . . wire communications in furtherance of the scheme." *United States v. Wynn*, 684 F.3d 473, 477 (4th Cir. 2012). Here, the preamble to Counts Five and Six of the indictment charged Barringer as follows:

> On, about, and between November 2014 to September 2016, in the Western District of Virginia, TERESA BLANKENSHIP BARRINGER devised and intended to devise a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises.
>
> It was part of the scheme that BARRINGER submitted forms containing one or more materially false statements to [AXA] to obtain monetary disbursements from [AXA].

J.A. 20. It then detailed the specific instances of each alleged wire fraud.[7]

---

[7] Count Five cited Barringer's "[r]eason for request[ing]" $311,859.04 on November 20, 2014—"to prevent eviction from a principal residence or the foreclosure of the mortgage on my principal residence"—as a false statement. J.A. 20. Count Six detailed

Barringer argues that the Government's "monetary disbursements" theory insufficiently charged her with wire fraud. On this point, she contends that "obtain[ing] monetary disbursements from [AXA]" does not equate to "a scheme to defraud" under § 1343 because that element has "the common understanding of wronging one in his property rights by dishonest methods or schemes, and usually signif[ies] the deprivation of something of value by trick, deceit, chicane, or overreaching." *Carpenter v. United States*, 484 U.S. 19, 27 (1987) (citation and internal quotation marks omitted).

But any error as to the district court's denial of Barringer's pretrial motion to dismiss the wire fraud counts on this basis was harmless because it subsequently granted her motion for a judgment of acquittal on these charges. J.A. 697 ("[T]he government failed to prove an essential element of wire fraud—that someone was deprived of a property interest due to the defendant's misrepresentations. The wire fraud convictions must be set aside."). Barringer responds, however, that such an error was not harmless because she was prejudiced by impermissible spillover evidence from the wire fraud counts that tainted the jury's consideration of the remaining counts. We do not find that argument convincing.

When faced with an evidentiary spillover challenge, we "must determine whether evidence admitted to support a reversed count prejudiced the remaining counts to warrant their reversal." *United States v. Hornsby*, 666 F.3d 296, 311 (4th Cir. 2012). Barringer must therefore demonstrate that the challenged evidence would have been inadmissible without

Barringer's September 2, 2016, request to obtain $50,535.08 based on the following false statement: "The Election of Benefits is submitted because the participant is [n]o longer employed by [J&R] and/or past Normal Retirement Age (date no longer employed 8/31/16)." *Id.* (first alteration in original).

the wire fraud counts. *Id.* She points to two particular kinds of allegedly prejudicial spillover evidence introduced as a result of the wire fraud charges going to trial: the withdrawal forms she used to obtain the funds from her 401(k) account, and the "character attack" that ensued based on the line of questioning and argument that her actions jeopardized J&R's entire 401(k) plan.

Even absent the wire fraud counts, we are persuaded that the withdrawal forms would have been admissible at a trial on the remaining counts. The Government introduced these forms during Vincek's testimony, which detailed the procedure to obtain 401(k) distributions and discussed the fraud warnings included on the forms. At bottom, these forms would have been admissible in a trial on the remaining counts because "evidence of the underlying crime [(i.e., alleged wire fraud completed via the withdrawal forms)] and the defendant's part in it is admissible to show the motive for [her] efforts to interfere with the judicial process[] [(i.e., her subsequent false statements to investigators)]." *Id.* (quoting *United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988)). In other words, "the evidence with respect to the [withdrawal forms] was necessary to complete the story of [Barringer's false statements during] the federal investigation against [her]." *Id.* Barringer seemingly recognizes the connection between the withdrawal forms and the remaining counts, as she explains, "Although only Count 8 explicitly referenced her withdrawal application, *all three [false statement] counts, in fact, related to the withdrawal forms for her 401(k)*." Opening Br. 13 (emphasis added). Accordingly, Barringer fails to demonstrate that this evidence would have been inadmissible at a trial on the remaining counts, meaning it does not constitute impermissible spillover.

A closer question is whether the Government's line of questioning and argument on how Barringer's actions "could" have "put the entire 401(k) plan in jeopardy" "[f]or the whole company" would be admissible. J.A. 116. While this contention was arguably necessary for the wire fraud counts to demonstrate an element of that offense—that Barringer defrauded another of a property interest[8]—it is arguably not relevant to any element of the tax fraud or false statement counts. Said another way, in a trial on those remaining counts, the Government's line of argument could perhaps be excluded under Federal Rule of Evidence 403 for "confusing the issues[] [and/or] misleading the jury."

Under those circumstances, it could also possibly be excluded under that Rule for "unfair prejudice." At trial, the Government relied on its jeopardizing-the-plan theory on several occasions, which, Barringer claims, bolstered the view that she was "a serial liar and cheat." Opening Br. 24; *see* J.A. 541 ("Mr. Vincek also told you that lies about a 401(k) can also endanger the whole plan. That if money is taken out for invalid reasons under a 401(k), that that's a problem for all the employees in a company and can endanger the validity of everyone's 401(k)."); J.A. 545 ("[Barringer's lie] mattered because it risked the whole plan."); J.A. 551 ("[Wire fraud] mattered to AXA and it mattered to the jeopardization of everyone else's 401(k) plans."); *see also United States v. Rooney*, 37 F.3d 847, 856 (2d Cir. 1994) ("It is only in those cases in which evidence is introduced on the

---

[8] At trial, the Government claimed that the plan had a property interest in Barringer's 401(k) account. J.A. 555 ("The plan itself controls the assets in the plan until they are withdrawn. Accordingly, the plan has property rights in the assets of the plan until it withdraws."). As the district court's grant of the posttrial motion for a judgment of acquittal on the wire fraud counts necessarily reflects, this proposition was not proven.

13

invalidated count that would otherwise be inadmissible on the remaining counts, *and* this evidence is presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts, that spillover prejudice is likely to occur.").

Though perhaps close, however, we perceive no prejudice to Barringer when this challenged evidence is considered in context. Indeed, any potential prejudice was mitigated by the strength of the Government's evidence on the remaining counts, the district court's jury instruction to consider each count separately, and the overall core similarity of the facts underlying all counts.

Here, "the Government presented strong evidence to support the [false statement] convictions." *Hornsby*, 666 F.3d at 312. For example, Barringer's statement during her interview with investigators that her employment with J&R ended on August 31, 2016, directly contradicted her claims in two other court cases. Complaint at 3, *Barringer v. J & R Manufacturing, Inc.*, No. CL15-415 (Tazewell Cty., Va. Cir. Ct. Mar. 22, 2017) (listing Barringer's "last day of employment" as "October 28, 2016");[9] Barringer's Answer to Riley's Complaint & Counterclaims at 13, *Riley v. Barringer*, No. 1:18-cv-00007-JPJ-PMS (W.D. Va. filed June 5, 2018), ECF No. 36 (same). Barringer's statement that she needed funds from her 401(k) account because she was worried about a possible foreclosure if J&R collapsed is contradicted by the evidence that her mortgage was up-to-date and had

---

[9] Barringer filed this document as an exhibit to her pretrial motion to dismiss in the district court below. *See* Additional Evidence re: Motion to Dismiss, *United States v. Barringer*, No. 1:19-cr-00051–JPJ–PMS–1 (W.D. Va. Nov. 12, 2019), ECF No. 23. It is not included in either the Joint Appendix or the Supplemental Joint Appendix.

14

less than a $200,000 remaining balance, which was substantially less than the $311,859.04 she withdrew for claimed hardship purposes. And Barringer's claim that she received no payments from J&R after August 31, 2016, was directly contradicted by payroll records. As for the tax fraud convictions, which she does not challenge on appeal, the Government presented strong evidence on these counts as well, eliciting testimony from IRS Special Agent McMurray, who explained that J&R had unpaid taxes in the first three quarters of 2016. The strength of the Government's evidence on the remaining counts thus mitigated any prejudicial spillover. *See Hornsby*, 666 F.3d at 312 (relying on the Government's "strong evidence" in holding "that there was no prejudicial spillover of evidence"); *United States v. Gjurashaj*, 706 F.2d 395, 400 (2d Cir. 1983) (rejecting claim of prejudicial spillover based on the strength of the Government's evidence on remaining counts).

"[A]ny concerns of prejudicial spillover were also mitigated by the district court's explicit instruction that the jury must consider . . . each count separately." *United States v. Campbell*, 963 F.3d 309, 319 (4th Cir.), *cert. denied sub nom. Washington v. United States*, 141 S. Ct. 927 (2020). Here, the district court instructed the jury that it "should consider the evidence separately as to each count and only return a verdict of guilty as to each separate charge if the evidence proves all of the elements of that charge against the defendant, beyond a reasonable doubt." J.A. 643. And, except in "*extraordinary* situations, we adhere to the crucial assumption that jurors carefully follow instructions." *United States v. Rafiekian*, 991 F.3d 529, 550 (4th Cir. 2021) (alteration, citation, and internal quotation marks omitted).

15

Finally, all counts shared similar underlying facts. For example, the factual basis underlying the indictment originated with Barringer failing to pay J&R's 941 taxes, knowing that this was wrong, and yet making other payments, including to herself, despite this knowledge. As IRS Special Agent McMurray explained, "there was money in [J&R's] account that could have been paid to the IRS [for the delinquent 941 taxes], but [Barringer] chose to pay herself and other vendors." J.A. 281. And Barringer conceded this in her testimony. She "kn[ew] that that money should [have] be[en] going to [the] IRS first before the other people," but she "kept writing the checks to other vendors." J.A. 386. This factual connection further supports our conclusion that any spillover was not prejudicial to her. *See United States v. Livingston*, 63 F. App'x 106, 107 (4th Cir. 2003) (per curiam) ("Where the reversed and the remaining counts are 'premised on essentially the same facts . . . evidence relevant and admissible as to one set was equally relevant and admissible as to the other; [a]ny "spillover" which may have occurred therefore was not prejudicial.'" (alterations in original) (quoting *United States v. Odom*, 858 F.2d 664, 666–67 (11th Cir. 1988))). For these reasons, we conclude that Barringer fails to demonstrate prejudice as to any impermissible spillover evidence.

Accordingly, any error as to the district court's denial of Barringer's pretrial motion to dismiss the wire fraud counts was harmless.[10] For the same reasons, we also reject

---

[10] For the reasons already discussed, the district court did not err when denying Barringer's renewed motion to dismiss the wire fraud counts at the close of the Government's case-in-chief and at the close of the evidence.

16

Barringer's argument that the district court erred when declining to grant her motion for a new trial, as it is largely duplicative of her impermissible spillover claim.[11]

3.

Barringer also contends that the district court erred when denying her pretrial motion to dismiss the false statement counts. To sustain a conviction under 18 U.S.C. § 1001(a) for a materially false statement, the Government must prove:

> (1) that the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false; (2) the defendant acted knowingly or willfully; and (3) the false statement or concealed fact or false document was material to a matter within the jurisdiction of the agency.

*United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998). Barringer contends that, given the invalidity of the wire fraud counts, her statements to investigators were not "*material* to a matter within the *jurisdiction* of the agency." *Id.* (emphases added). But her understanding of both of those terms is too constrained.

"[T]he term jurisdiction should not be given a narrow or technical meaning for purposes of § 1001. The term refers to the department's or agency's power to exercise authority in a particular situation, and that power need not include the power to make final or binding determinations." *United States v. Jackson*, 608 F.3d 193, 196–97 (4th Cir. 2010) (citations and internal quotation marks omitted). The Supreme Court has held that "the investigation of wrongdoing is a proper governmental function; and since it is the very

---

[11] We "review[] 'the district court's denial of a motion for a new trial under an abuse of discretion standard' of review." *United States v. Wolf*, 860 F.3d 175, 189 (4th Cir 2017) (citation omitted).

purpose of an investigation to uncover the truth, any falsehood relating to the subject of the investigation perverts that function." *Brogan v. United States*, 522 U.S. 398, 402 (1998) (emphasis omitted).

Barringer contends that her false statements did not relate to a matter within the Government's jurisdiction because "the statements in her application to withdraw her own 401(k) funds could not implicate a crime against the United States [(i.e., wire fraud)] and, therefore, the criminal investigation of those statements did not fall within the agency's jurisdiction." Opening Br. 15; *see also id.* at 19. But the investigation was not only into whether Barringer committed wire fraud; it also broadly targeted financial crimes at J&R. J.A. 206 (IRS Special Agent McMurray testifying that "[a]t that time [investigators] were looking at the employment tax and potential wire fraud"). Accordingly, assuming *arguendo* that the investigators knew they could not prosecute Barringer for wire fraud, her statements during the interview still would have been within their jurisdiction as relevant to the broader investigation of J&R, particularly the unpaid taxes. *See* J.A. 206–07 (IRS Special Agent McMurray's testifying, "Q. [H]ow would things like employment dates be relevant to [employment tax and wire fraud crimes]? A. Well, depending on the document, it would be very relevant as far as [an] employment tax case. . . . Q. What about things like pay dates or the reasons people are trying to get money? A. Well, those are all important, yes. Q. Are they the kind of information that would affect how you might run an investigation, what you might do in an investigation? A. Yes. Because if it's a financial transaction, we're going to look at the date that financial transaction occurred and the circumstances around it. So dates are very relevant."); *see also United States v. Rodgers*,

18

466 U.S. 475, 479 (1984) ("A criminal investigation surely falls within the meaning of 'any matter,' and . . . [a] department or agency has jurisdiction, in this sense, when it has the power to exercise authority in a particular situation." (quoting 18 U.S.C. § 1001)); *United States v. Grenier*, 513 F.3d 632, 638 (6th Cir. 2008) (finding meritless an argument that because an agency could not take a particular action, it lacked "jurisdiction," as that term is used in § 1001).

As for materiality, for purposes of § 1001, a "materially false" statement is one that "has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012) (citation omitted). Whether the false statement actually influenced an agency's action is irrelevant. *Id.*; *see also United States v. Raza*, 876 F.3d 604, 616–17 (4th Cir. 2017) (collecting cases and holding that when the Government is the victim of the false statement, it "must be capable of influencing . . . the particular government agency or public officials that were targeted").

Here, Barringer argues that since the 401(k) funds belonged to her, "she could not commit wire fraud" and, therefore, the "false statements could not influence the decision to charge her with offenses related to that withdrawal." Opening Br. 20. This argument is also inaccurately narrow. Quite simply, her answers during the interview were material because they "ha[d] a natural tendency to influence, or [were] capable of influencing" the direction of the investigation. *Hamilton*, 699 F.3d at 362 (citation omitted); *see also Brogan*, 522 U.S. at 402; *Raza*, 876 F.3d at 616–17. Of course, her statements did not

influence the investigation in a direction favorable to her, but that does not undermine their inherently material nature. *See Hamilton*, 699 F.3d at 362.

We thus conclude that Barringer's statements to investigators were "material to a matter within the jurisdiction of the agency." 18 U.S.C. § 1001. Accordingly, we perceive no error in the district court's denial of Barringer's pretrial motion to dismiss the false statement counts.[12]

We briefly address Barringer's related claim that the district court erred when it declined to grant her motion for a judgment of acquittal, *see* Fed. R. Crim. P. 29, on the false statement counts. We "review de novo a district court's denial of a Rule 29 motion . . . [and] must affirm a conviction when substantial evidence viewed in the light most favorable to the prosecution supports the verdict." *United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021) (citations and internal quotation marks omitted). In determining whether substantial evidence exists, we "make all reasonable inferences in favor of the government and do not weigh evidence or credibility." *Id.* (citation and internal quotation marks omitted). Substantial evidence exists "when a reasonable jury could find it adequate and sufficient to establish guilt beyond a reasonable doubt." *Id.* (citation and internal quotation marks omitted).

For the reasons already discussed, we are persuaded that substantial evidence supports Barringer's conviction on the false statement counts. Barringer nonetheless

---

[12] For the reasons already discussed, the district court did not err when denying Barringer's renewed motion to dismiss the false statement counts at the close of the Government's case-in-chief and at the close of the evidence.

responds that her conviction on Count Eight for a "False Statement to Federal Agents Regarding Reason for Obtaining Money" is invalid because the Government failed to negate every reasonable, truthful interpretation of her statement that she needed the funds from her 401(k) account to prevent foreclosure. J.A. 21. However, "[a]s a general proposition, circumstantial evidence may be sufficient to support a guilty verdict even though it does not exclude every reasonable hypothesis consistent with innocence." *United States v. Zayyad*, 741 F.3d 452, 464 (4th Cir. 2014) (citation and internal quotation marks omitted). And "[t]he jury was entitled to reject the theory consistent with innocence and accept the one consistent with guilt, so long as there was substantial evidence for its choice." *Id.* (citation and internal quotation marks omitted).

Substantial evidence was present as to Count Eight. As discussed above, the evidence reflected that Barringer's mortgage was up-to-date and had less than a $200,000 remaining balance, which was substantially less than the $311,859.04 she withdrew for claimed hardship purposes. This evidence directly contradicted her assertion that she needed funds from her 401(k) account because she was worried about a possible foreclosure if J&R collapsed. The jury was entitled to credit this substantial evidence when considering Count Eight. Accordingly, we find no error in the district court's denial of Barringer's motion for a judgment of acquittal on the false statement counts.

B.

Barringer also raises a due process claim, asserting that the Government knowingly relied on Vincek's "patently false" testimony that Barringer's actions could have put J&R's entire 401(k) plan in jeopardy. Opening Br. 38–39; *see also United States v. Bush*, 944 F.3d

21

189, 197 (4th Cir. 2019) ("[A] conviction obtained through use of false evidence, known to be such by representatives of the State, must fall under the Fourteenth Amendment [as a due process violation]." (quoting *Napue v. Illinois*, 360 U.S. 264, 269 (1959)), *cert. denied*, 140 S. Ct. 2628 (2020)).

Because Barringer did not raise this claim below, it is reviewed for plain error. *United States v. Seignious*, 757 F.3d 155, 160 (4th Cir. 2014); *see* Fed. R. Crim. P. 52(b). To establish plain error, Barringer must demonstrate that "there has been (1) error; (2) that is plain . . . ; [and] (3) that [it] affects [her] substantial rights." *United States v. Seigler*, 990 F.3d 331, 342 (4th Cir. 2021) (citation and internal quotation marks omitted). Even if these requirements are met, our "authority to recognize plain error is 'permissive, not mandatory,' and should be employed only to prevent 'a miscarriage of justice.'" *Id.* (citation omitted).

We detect no plain error here. At bottom, we are unconvinced that Vincek's testimony was patently false. In fact, Vincek's testimony that Barringer's improper distributions "could" "put the entire 401(k) plan in jeopardy" "[f]or the whole company" was plausibly accurate because her actions could have impacted the plan's tax-favored status. J.A. 116. Even if that result may not have been a likely one, it was not an incorrect statement of the potential legal consequences of Barringer's actions.

A tax-favored retirement plan such as a 401(k) "may be disqualified for failing to operate in accordance with the . . . plan's terms" or with other requirements imposed by the Tax Code, which could include improper hardship distributions such as the one Barringer received. *Hull v. I.R.S.*, 656 F.3d 1174, 1184 (10th Cir. 2011); *see also* Marcia

22

Beth Stairman Wagner et al., *U.S. Income: EPCRS—Plan Correction and Disqualification*, 375–3d Tax. Mgmt. Port. (BNA) § I ("When a plan fails to satisfy the qualification rules — either because the plan's terms are lacking or because the plan has not been operated in accordance with its terms or other legal requirements — the plan may be 'disqualified.'"). Disqualification can "result in the plan losing its tax-exempt status," thereby affecting employees, the employer, and the plan's trust. *Hull*, 656 F.3d at 1184. For instance, "[i]f a plan loses its protected status, employer contributions become immediately taxable to the participants to whom they are owed, removing incentives for employer and employee to continue their participation in the Plan." *Carter v. Pension Plan of A. Finkl & Sons Co. for Eligible Off. Emps.*, No. 08 C 7169, 2010 WL 1930133, at *11 (N.D. Ill. May 12, 2010) (citing 26 C.F.R. § 1.402(b)–1), *aff'd*, 654 F.3d 719 (7th Cir. 2011); *accord* Wagner et al., *supra*, § I(B)(3)(a)(1), (c). We do not speculate on whether Barringer's actions *would* have led to this consequence, but we note that Vincek's testimony that it *could* have caused the foregoing was not patently false, as Barringer claims.

Accordingly, Barringer cannot demonstrate that an error occurred, let alone a plain one. *See United States v. Roane*, 378 F.3d 382, 401 (4th Cir. 2004) (declining to entertain a due process claim based upon assertion that a Government witness lied because there was "no evidence" provided to substantiate the claim and noting that "conclusory accusations that the Government should have known that a statement was false, without more" are insufficient). Therefore, her due process claim fails.

23

## III.

We now turn to Barringer's arguments on the abuse-of-trust enhancement under U.S.S.G. § 3B1.3. Generally, "[w]e review sentences 'under a deferential abuse-of-discretion standard.'" *United States v. Dennings*, 922 F.3d 232, 235 (4th Cir. 2019) (quoting *Gall v. United States*, 552 U.S. 38, 41 (2007)). But "[o]n a challenge to a district court's application of the Guidelines, we review questions of law de novo and findings of fact for clear error." *United States v. Hawley*, 919 F.3d 252, 255 (4th Cir. 2019) (citation omitted).

### A.

The Guidelines provide for a two-level enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The Sentencing Commission's Commentary to § 3B1.3 explains its application:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult).

U.S.S.G. § 3B1.3 cmt. n.1. The enhancement is therefore proper "in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination," but not "in the case of an embezzlement or theft by an ordinary

24

bank teller or hotel clerk." *Id.* Finally, the enhancement is not to be added "if an abuse of trust or skill is included in the base offense level or specific offense characteristic." U.S.S.G. § 3B1.3.

When assessing whether the defendant abused a position of trust, we typically consider three factors, "including (1) whether the defendant had special duties or special access to information not available to other employees, (2) the extent of the discretion the defendant possessed, and (3) whether the defendant's actions indicate that he is more culpable than others in similar positions who engage in criminal acts." *United States v. Abdelshafi*, 592 F.3d 602, 611 (4th Cir. 2010) (citing *United States v. Akinkoye*, 185 F.3d 192, 203 (4th Cir. 1999)). The analysis is assessed from the victim's point of view, which is the IRS in this case. *Wolf*, 860 F.3d at 200; *see also United States v. Smith*, 353 F. App'x 869, 872 (4th Cir. 2009) (per curiam) ("The question must be examined from the perspective of the victim. Smith contends that no relationship of trust existed between him and the IRS, which was identified as the victim of the offense[.]" (citation omitted)); *United States v. May*, 568 F.3d 597, 603 (6th Cir. 2009) ("[T]he IRS . . . is the victim of May's Section 7202 offense.").

B.

The district court concluded that the abuse-of-trust enhancement was proper because Barringer held a position of trust as to the Government to collect and pay the 941 taxes:

> [N]ormally if a person is being prosecuted criminally for failing to pay their taxes . . . they don't abuse their trust. But in a case such as this . . . , a person such as Ms. Barringer is placed in a position of trust by the government to

25

collect, hold, and deposit funds; so-called employment taxes, to hold in trust and deposit for the government. . . . I believe that that position of trust meets the qualifications of Section 3B1.3.

Supp. J.A. 24.

On appeal, Barringer first contends that the district court erred when finding that she occupied a position of trust. On a preliminary point, we note the conflicting precedent on the standard of review for this inquiry. *Compare United States v. Ebersole*, 411 F.3d 517, 535–36 (4th Cir. 2005) ("We review de novo the district court's legal interpretation of what constitutes 'a position of trust' under § 3B1.3."), *with Smith*, 353 F. App'x at 872 ("The district court's decision that a defendant had a position of trust is a factual determination reviewed for clear error." (citing *United States v. Bollin*, 264 F.3d 391, 415 (4th Cir. 2001), *overruled on other grounds by United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017))). We need not resolve this question here because, even if we conducted a de novo review, we would reach the same conclusion that Barringer's role qualified as a position of trust.

Specifically, our review of the *Abdelshafi* factors on this record reflects the comprehensive scope of Barringer's position at J&R, which was a position of trust. As IRS Special Agent McMurray testified, "[Barringer] was responsible for the accounting. She was responsible for the payroll. She did sales. She was responsible for collecting monies owed to the company by customers. *She basically ran the company*." J.A. 209 (emphasis added). He also explained the significant discretion she retained in that position as to payments: "As the second in command in that company, she could have chosen whatever she wanted [as] to who not to pay." J.A. 283. For instance, he explained that "there was

26

money in the account that could have been paid to the IRS [for the delinquent 941 taxes,] but she chose to pay herself and other vendors." J.A. 281.

> Barringer's own testimony confirmed the extensive nature of her position:

> My duties were day-to-day operations of the company. And that included . . . taking sales over the phone, being the liaison between the customers [and] J&R, making sure that we had inventory to meet the needs, the bookkeeping as far as accounts payable, receivables, payroll, inventory. Did cost accounting for 17 product lines. Did some of the advertising and the advertising brochures, and worked directly with the companies, the customers.

J.A. 345. In fact, Barringer confirmed that she was "the one signing the checks," "the one signing the taxes," and was "in charge of the 401(k) withholdings." J.A. 371–72, 383. On this point, she conceded that she was "putting the [company] money . . . to [her]self and not the IRS." J.A. 386. And even though she "kn[ew] that that money should [have] be[en] going to [the] IRS first," she instead "kept writing the checks to other vendors." J.A. 386.

Barringer's corporate role and the discharge of her duties sufficiently demonstrate that she conducted J&R's affairs with significant discretion and occupied a position of trust, particularly related to the delinquent payroll taxes, because her position was "characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)." U.S.S.G. § 3B1.3 cmt. n.1. Our decision in *Smith* is instructive on this point. There, we affirmed the district court's application of the abuse-of-trust enhancement on clear-error review under similar circumstances. As president of the corporation in question, Smith "defrauded the IRS by using corporate funds extensively for personal vehicles and other personal purchases without reporting the assets acquired as personal income" and by "us[ing] color-coded

27

checks to avoid payroll reporting requirements." *Smith*, 353 F. App'x at 870. Smith subsequently pleaded guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and fraudulent receipt of bankruptcy property, in violation of 18 U.S.C. §§ 152(2), 2. *Id.* At sentencing, over Smith's objections, the district court applied the abuse-of-trust enhancement, finding that Smith "had the primary responsibility for manipulation of the payroll and expense checks to carry out the fraud involving trust fund taxes and that his position as president afforded him discretion that facilitated the offense." *Id.* at 871.

On appeal, Smith asserted that the district court erred when applying this enhancement because "no relationship of trust existed between him and the IRS." *Id.* at 872. We disagreed, explaining that "as an employer, Smith was placed in a position of trust by the government. He was entrusted with collecting, holding, and depositing funds designated in part for Social Security and Medicare and his failure to carry out this responsibility victimized taxpayers." *Id.* Indeed, we noted that Smith "had both a fiduciary obligation to the IRS to carry out this responsibility, and a fiduciary relationship with the employees of [the company] which carried the same obligation." *Id.* at 873. At bottom, we explained that "it is essential that the government be able to trust employers to collect, hold in trust, and deposit the 'employment taxes' owed by the employees and the company." *Id.* at 872–73. Therefore, we affirmed the district court's application of the abuse-of-trust enhancement.

Considering the wide discretion accorded Barringer in her position at J&R, *Smith*'s reasoning applies with equal force here. As Barringer "basically ran the company," J.A. 209, she had a "fiduciary obligation to the IRS to carry out" her legal duty to collect and

28

pay over the 941 taxes, *Smith*, 353 F. App'x at 873. Moreover, a portion of the 941 taxes were withheld from employees' income to pay their share of their income taxes, and she held them solely for transmission to the IRS. Therefore, we cannot say that the district court erred when determining that Barringer's discretionary role at J&R constituted a position of trust.

Barringer nonetheless directs us to the Sixth Circuit's decision in *May* to contend that her responsibilities do not support an abuse-of-trust enhancement. In that case, the Sixth Circuit reversed the district court's application of the abuse-of-trust enhancement on de novo review. May was the "registered agent, majority shareholder, sole director, and president" of the corporation in question and, in this role, possessed sole authority to sign checks for the company and otherwise maintained "strict control over company correspondence." 568 F.3d at 600. Upon investigation into the corporation, the IRS "discovered that [it] had never filed either an income tax return or an employment tax return." *Id.* The investigation culminated in an indictment against May, and he was subsequently convicted of willfully evading his personal income tax liability, in violation of 26 U.S.C. § 7201, and failing to account for and pay over payroll taxes, in violation of 26 U.S.C. § 7202. *Id.* at 600–01. At sentencing, the PSR recommended a two-level enhancement for abuse-of-trust based on his role as the sole director of the company in question. *Id.* at 601. Over May's objections, the district court adopted the PSR and applied the enhancement. *Id.*

On appeal, the Sixth Circuit explained that "[t]he level of discretion accorded an employee is to be the decisive factor in determining whether his position was one that can

29

be characterized as a trust position." *Id.* at 603 (citation omitted). However, it then held that the district court erred when applying the abuse-of-trust enhancement because May had not been in a position of trust given his lack of decision-making discretion to collect and transfer payroll taxes to the IRS. *Id.* Specifically, the court reasoned,

> May's role would appear to be more like that of a bank teller—May's only duty was to collect the money and pass it along to the government, as a teller's only job is to collect depositors' money and pass it along to the bank—rather than that of a bank executive. May had no discretion. The law simply required May to collect the payroll taxes from his employees and transfer the funds to the IRS.

*Id.* (internal citations omitted).

Although this case is analogous to Barringer's, we do not find its reasoning persuasive and decline to follow it. Critically, the Sixth Circuit's conclusion is a *non sequitur* given the facts of the case. As the majority shareholder, sole director, and president of the corporation in question, May possessed significant discretionary authority, including the sole right to sign checks for the company. *May*, 568 F.3d at 600. This role ought to have qualified as a position of trust considering the Sixth Circuit's emphasis on discretion as the "decisive factor in determining whether his position was one that can be characterized as a trust position," *id.* at 603 (citation omitted), which is an accurate characterization of the Guidelines, U.S.S.G. § 3B1.3 cmt. n.1 ("'Public or private trust' refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference)."). Accordingly, we cannot subscribe to the Sixth Circuit's conclusion in *May*.

30

However, *May*'s underlying principles on discretion actually support our conclusion here. If we were to consider Barringer's discretion as the dispositive factor in our analysis, as the Sixth Circuit contemplated, we would readily conclude that she occupied a position of trust. As discussed above, Barringer effectively ran J&R's affairs, determining in that position whom to pay and when, as well as signing the company's checks to that effect. Under *May*'s principles, we would therefore reach the same conclusion that the district court did not err when finding that Barringer occupied a position of trust.

Next, Barringer claims that the district court erroneously applied this enhancement because it results in double-counting. That is to say, she posits that an element of her tax-fraud conviction under 26 U.S.C. § 7202 (being a "responsible person") includes the same conduct as that penalized by the enhancement (occupying a position of trust), meaning she is ineligible for the enhancement. We disagree.

Section 7202 provides,

> Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

26 U.S.C. § 7202. To obtain a conviction under this section, the Government was first required to prove that Barringer was a "responsible person"—that is, the "person required . . . to collect, account for, and pay over" the relevant 941 taxes. *See Turpin v. United States*, 970 F.2d 1344, 1347 (4th Cir. 1992). As the jury instructions accurately reflected, a "responsible person" is one "who has significant, although not necessarily exclusive or

final, control or authority over the employer's finances or disbursement of the employer's funds." J.A. 648; *see Erwin v. United States*, 591 F.3d 313, 321 (4th Cir. 2010) ("[T]he essential inquiry is whether a person has significant, but not necessarily exclusive, authority over corporate finances or management decisions.").

Critically then, while the Government was required to make this showing to obtain a conviction for tax fraud under § 7202, it was not obligated to prove that Barringer also occupied a position of trust as contemplated by § 3B1.3. *United States v. Taylor*, 323 F. App'x 806, 807 (11th Cir. 2009) (per curiam) (explaining that the defendant's "base offense level was based on his tax evasion and did not account for his abuse of trust" (citing 26 U.S.C. § 7202; U.S.S.G. § 2T1.6)); *United States v. Lombardo*, 281 F. App'x 78, 82 (3d Cir. 2008) ("Application of 26 U.S.C. § 7202 is proper where the defendant failed to truthfully account for and pay over withholding tax. Application of U.S.S.G. § 3B1.3 applies where the defendant abused of [sic] a position of trust that significantly facilitated the commission or concealment of the offense. . . . It was not necessary for the Government to prove an abuse of trust as defined by the Guidelines in order to convict under 26 U.S.C. § 7202. The District Court did not count the same underlying conduct twice.").

While it is true that many responsible persons under § 7202 will also occupy positions of trust, being a responsible person does not *ipso facto* equate to holding a position of trust for U.S.S.G. § 3B1.3 purposes. Indeed, it is possible to be a responsible person under § 7202 and yet be ineligible for the abuse-of-trust enhancement. Consider, for instance, a hypothetical defendant who is the responsible person for purposes of collecting and paying over the 941 taxes and nonetheless has minimal or limited discretion

32

in that role. *See Johnson v. United States*, 734 F.3d 352, 361–62 (4th Cir. 2013) (holding that a corporation's sole shareholder was a "responsible person" under 26 U.S.C. § 6672,[13] despite her delegation of the company's "daily affairs and [authority] to execute checks and other legal documents" to another employee). Such a defendant would not qualify for the abuse-of-trust enhancement as her circumstances would be more akin to "an ordinary bank teller or hotel clerk" than "an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination." U.S.S.G. § 3B1.3 cmt. n.1. Accordingly, Barringer was not fundamentally exempt from application of this enhancement based simply on the elements of her § 7202 conviction, meaning the district court did not engage in impermissible double-counting.

We therefore conclude that the district court did not err when applying the abuse-of-trust enhancement.

IV.

For the reasons discussed above, the judgment of the district court is

*AFFIRMED.*

---

[13] Sections 6672 and 7202 effectively operate in tandem. While § 6672 provides for civil liability and penalties for failure to pay taxes, § 7202 subjects the perpetrator to a felony conviction. *See Slodov v. United States*, 436 U.S. 238, 245 (1978) ("Thus, an employer-official or other employee responsible for collecting and paying taxes who willfully fails to do so is subject to both a civil penalty equivalent to 100% of the taxes not collected or paid [under § 6672], and to a felony conviction [under § 7202]."); *see also United States v. Lord*, 404 F. App'x 773, 775 (4th Cir. 2010) (relying on cases interpreting the "responsible person" requirement under § 6672 to interpret that same requirement under § 7202).