**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 20-4414**

───────────────

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

ALEXANDER SAMUEL SMITH, a/k/a Amir Alexander,

Defendant – Appellant.

───────────────

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Max O. Cogburn, Jr., District Judge.  (3:17−cr−00182−MOC−DSC−1)

───────────────

Argued:  March 11, 2022                    Decided:  December 1, 2022

───────────────

Before GREGORY, Chief Judge, and DIAZ and HEYTENS, Circuit Judges.

───────────────

Affirmed in part, reversed in part, judgment vacated, and case remanded for resentencing by published per curiam opinion, in which Chief Judge Gregory and Judge Heytens joined in full.  Judge Diaz joined the per curiam opinion in part.  Judge Heytens wrote a concurring opinion.  Judge Diaz wrote an opinion dissenting in part.

───────────────

**ARGUED:**  James Walter Kilbourne, Jr., ALLEN STAHL & KILBOURNE, PLLC, Asheville, North Carolina; Allie Jordan Hallmark, HAMILTON WINGO LLP, Dallas, Texas, for Appellant.  Amy Elizabeth Ray, OFFICE OF THE UNITED STATES ATTORNEY, Asheville, North Carolina, for Appellee.  **ON BRIEF:**  Charles D. Swift, CONSTITUTIONAL LAW CENTER FOR MUSLIMS IN AMERICA, Richardson, Texas, for Appellant.  William T. Stetzer, Acting United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Charlotte, North Carolina, for Appellee.

───────────────

PER CURIAM:

A jury convicted Alexander Samuel Smith on two counts of lying to the FBI, violating 18 U.S.C. § 1001(a)(2). The district court sentenced him to concurrent 60-month prison terms. On appeal, Smith challenges (1) the district court's denial of his motion to dismiss Count Two of his indictment as multiplicitous, (2) the sufficiency of the evidence supporting the jury's verdict, (3) the district court's allegedly prejudicial statements to the jury, (4) the district court's refusal to give an entrapment instruction, and (5) the district court's application of a terrorism enhancement at sentencing.

As explained below, we reverse the district court's denial of the motion to dismiss Count Two, vacate the judgment, and remand for resentencing. We otherwise affirm.

I.

A.

Acting on an informant's tip, the FBI began investigating Smith in the summer of 2014. Smith had asked the informant for help in traveling to Syria to participate in its civil war. As far as the investigating agents knew, Smith wanted to join the armed conflict between Syria's government and various factional forces, including the Islamic State of Iraq and Syria ("ISIS").[1] ISIS had recently solicited Westerners to join its fight.

Agents soon learned of a connection between Smith and the Kodaimatis—a father and son who were already under federal investigation for supporting ISIS. Smith once

---

[1] The United States had long designated ISIS a terrorist organization.

2

worked for the Kodaimatis and traveled to Syria with them in 2006.  Based on that connection and the informant's tip, agents became concerned that Smith was considering joining ISIS in Syria.  So agents had the informant refer Smith to a second informant, Abu Khalid.  Khalid would act as an ISIS recruiter who could facilitate Smith's travel plans.

Smith contacted Khalid and scheduled an in-person meeting for August 2014.  At the meeting, Smith told Khalid that he wanted to return to Syria to help defend a family whom he had once visited.  Smith explained that the family lived near a city divided between three warring groups, including ISIS.

Khalid responded that he was helping "brothers" go to Syria to join ISIS.  S.J.A. 2.[2] He asked Smith whether he "wanted to be with" the "leader of ISIS."  J.A. 665.  Smith answered, in Arabic, "inshallah."  J.A. 665.  But if Smith wanted to join ISIS, Khalid said, he would have to pledge allegiance to the group's leader.  Khalid explained that Smith would be "going to fight . . . under command of" ISIS, asking whether Smith would accept that.  S.J.A. 8.  Smith again responded in Arabic: "[n]a'am."  S.J.A. 8.  Khalid later testified that "inshallah" and "na'am" were affirmations.

For his part, Smith discussed his ability to fight, telling Khalid that he knew about hand-to-hand combat and weapons but lacked formal training.  Before leaving, Smith mentioned that he had a passport and would be ready to travel in a few weeks.  The pair made plans to talk again.

---

[2] Citations to the "S.J.A." refer to the Supplemental Joint Appendix filed in this appeal.

Between August and November 2014, Smith and Khalid met three more times. In their second and third meetings, Smith reaffirmed his desire to travel to Syria. Khalid told Smith that he'd be "expected to kill for ISIS if he went to Syria," and Smith said it would be "no problem." J.A. 693.

Because Smith often mentioned that he didn't have the money to buy his airfare to Syria, Khalid introduced Smith to Bilal, a third informant, to help him earn money for the trip. Bilal worked with Smith on odd jobs, including construction projects and car restorations. In the fourth meeting with Khalid, Smith offered to obtain discount airfare (or, a "buddy pass") for Khalid should he ever need it. Smith's then-girlfriend worked in customer service for an airline and could buy such passes.

Smith and Khalid didn't meet again until March 2015. Khalid asked Smith if he'd be able to get a buddy pass for Mohamed Hilal, a fictitious person the FBI had invented. Khalid told Smith that Hilal was important to ISIS and planning to travel to Syria.

Using another person's credit card, Smith and his girlfriend bought Hilal the pass. But when the pass went unused, Smith emailed Khalid to ask what happened. Khalid responded that Hilal got confused and didn't use the pass. Smith then cut off all contact with Khalid, saying he couldn't "have anything to do with this." S.J.A. 80.

B.

In February 2016, the FBI coordinated with the U.S. Attorney's Office in the Western District of North Carolina to issue a grand jury subpoena for Smith's now-wife. After his wife received the subpoena, Smith called the FBI and spoke with Agent Ronald

4

Godfrey—one of the agents investigating him. Smith agreed to visit the FBI's office and "explain the circumstances about [the] buddy pass." J.A. 537.

Godfrey, armed with knowledge of Smith's communications with Khalid, interrogated Smith. Godfrey asked Smith whether he spoke with Khalid about "possibly going to Syria," and Smith replied, "no." S.J.A. 81 at 1:55:55–1:56:00.[3] Godfrey also asked, "[H]ave you ever talked with anyone that you expressed to someone that you wanted to go to Syria and fight?" J.A. 797. Smith answered, "No, I've told them that I wished there was something I could do for people, but I never had any plans to go there and do anything." J.A. 797. And Godfrey asked if Smith had ever "talked with anyone that [Smith] wanted to go to Syria and join ISIS." J.A. 798. Smith responded, "No, we've talked – I talk to numerous – you have to understand the Muslim community. There's so much stuff going on now in the Muslim community with everything." J.A. 798. Though Godfrey warned Smith that he could get in trouble for lying to the FBI, providing a copy of § 1001, Smith stood firm that he never had any plan or intent to go to Syria.

Godfrey's questioning then turned to Hilal. Godfrey asked Smith if he knew that Hilal "was planning to use the buddy pass" to travel to Syria and join ISIS. S.J.A. 81 at 2:04:55–2:05:20. Smith said that he didn't know "anything [Hilal] was planning to do" and that he "didn't know what [Hilal] had in his mind [or] what his plans were." S.J.A. 81 at 2:05:20–2:05:30.

---

[3] S.J.A. 81 refers to a series of sequentially timestamped video exhibits on file with the Clerk of Court.

C.

A grand jury indicted Smith on two counts of making a materially false statement to a federal agent in violation of 18 U.S.C. § 1001(a)(2). Count One charged Smith with "falsely stating to FBI Special Agents then investigating a matter involving international terrorism that he had never discussed his desire or plans to travel to Syria." J.A. 20. Count Two charged him with telling the FBI "he did not know that [Hilal] intended to use the buddy pass procured by [Smith] to travel and support ISIS." J.A. 21. Smith moved to dismiss Count Two as multiplicitous, but the district court denied his motion.

The case proceeded to a jury trial. The government called four witnesses: Godfrey, Khalid, an expert on ISIS and other terrorist organizations, and an airline employee. The jury also heard recordings of Smith's conversations with Godfrey and Khalid.[4]

At the close of the government's case, Smith moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29. Smith argued that the government hadn't shown that he knowingly and willfully made a false statement or that his statements were material to the FBI's investigation. The district court denied Smith's motion. Smith then recalled Godfrey before unsuccessfully renewing his Rule 29 motion at the close of all evidence.

Smith asked the district court to instruct the jury on an entrapment defense. He claimed the FBI had instigated him to commit his alleged crimes through the subpoena and

---

[4] Relevant on appeal, the court said in overruling a government objection during Godfrey's cross-examination, "we have two counts of a violation of 1001, which indicate that there were . . . two falsehoods here." J.A. 835.

6

other pressure tactics the agency employed on his wife.  The court declined, reasoning that Smith hadn't shown that the FBI induced him to lie.  The court did, however, instruct the jury on informants, explaining that "the government is lawfully permitted to use decoys and deception to conceal the identity of its informants."  J.A. 982.

The jury returned a guilty verdict on both counts and found that each offense involved international terrorism.

### D.

Smith's presentence investigation report first recommended a 63- to 78-month prison term, based on a total offense level of 26 and a criminal history category of I.  But the government objected, arguing that U.S.S.G. § 3A1.4's terrorism enhancement should apply.  The probation office agreed with the government, increasing Smith's total offense level to 32 and his criminal history category to VI.  Smith's Guidelines sentence became 192 months' imprisonment—the statutory maximum.

The district court later overruled Smith's objection to the terrorism enhancement but varied downward, imposing two concurrent 60-month terms of imprisonment and three years' supervised release.  The court certified that its sentence would be appropriate regardless of the terrorism enhancement.

This appeal followed.

### II.

We begin with Smith's claim that the district court erred by declining to dismiss Count Two as multiplicitous.  "The rule against multiplicity is rooted in the Double

Jeopardy Clause of the Fifth Amendment" and protects against "the imposition of cumulative punishments for the same offense in a single criminal trial." *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012).

To determine whether convictions are multiplicitous, courts must first identify "[w]hat Congress has made the allowable unit of prosecution." *Id.* The controlling question is, thus, whether Congress intended the unit of prosecution under § 1001 to be a single statement. Such an interpretation would allow a defendant to be charged separately for each false statement made during a single interview. But, if "Congress fails to define the criminal unit or the legislative intent in this regard is ambiguous, any ambiguity should be resolved in favor of lenity." *United States v. Mason*, 611 F.2d 49, 51 (4th Cir. 1979) (citations omitted); *see also United States v. Davis*, 139 S. Ct. 2319, 2333 (2019) ("Employing the canon as the government wishes would also sit uneasily with the rule of lenity's teaching that ambiguities about the breadth of a criminal statute should be resolved in the defendant's favor.").

Smith maintains that "both of the alleged false statements were made . . . in the same interview and comprise only one violation of 18 U.S.C. § 1001." Appellant's Br. at 38. The thrust of this argument is that § 1001(a)(2) criminalizes a course of conduct rather than an individual false statement. Because we find that Congress's intent concerning § 1001(a)(2)'s unit of prosecution is ambiguous, we must apply the rule of lenity and find Count Two multiplicitous.

A.

Section 1001(a)(2) prohibits "any materially false, fictitious, or fraudulent statement or representation." When previously confronted with similar statutory language, we have found Congress's intent ambiguous.

In *Mason*, we held that the language of 18 U.S.C. § 922(a)(6) punishing "any false or fictitious oral or written statement" was "ambiguous with respect to the unit of prosecution." *United States v. Mason*, 611 F.2d 49, 52 (4th Cir. 1979). Our decision in *Mason* involved the Gun Control Act and the defendants' charges included "knowingly making a false statement in connection with the acquisition of a firearm in violation of 18 U.S.C. § 922(a)(6)." *Id.* at 50–51. Both defendants submitted written forms when purchasing firearms and falsely denied having been previously convicted of a felony on each form. Because the defendants purchased multiple firearms, and submitted one form per firearm, they were charged with multiple counts under § 922(a)(6) based on each form. To determine whether these counts were multiplicitous, we looked to the Supreme Court's analysis in *United States v. Bell*. *Id.* at 51 (citing *United States v. Bell*, 349 U.S. 81 (1955)).

In *Bell*, the Supreme Court held that the language employed in the Mann Act—prohibiting the knowing transportation in "interstate or foreign commerce" of "any woman or girl for the purpose of prostitution or debauchery, or for any other immoral purpose[,]"—was ambiguous. 349 U.S. at 82. The defendant in *Bell* transported two women simultaneously and in the same vehicle. Because the statutory language could be interpreted to support finding both that Congress intended the defendant to be charged once for each woman, or cumulatively charged once for both women, the Supreme Court found

9

the statutory language ambiguous and applied the rule of lenity.  Relying on *Bell*, we found that the statutory language in *Mason*, prohibiting "any false or fictitious oral or written statement" was also ambiguous as to the unit of prosecution.  *Mason*, 611 F.2d at 52.

Despite the similar language at issue here, our dissenting colleague distinguishes *Mason* by arguing that the *Mason* Court also relied on the way in which the Gun Control Act was administered.  *See* Dissenting Op. at 40.  But *Mason*'s discussion of the Gun Control Act's administration merely provided additional support to its primary holding that the statutory language was ambiguous under *Bell*.  Indeed, this Court introduced that discussion in *Mason* by stating, "[o]ur *conclusion* on this point is *buttressed* by the manner in which the Gun Control Act has been administered by the Bureau of Alcohol, Tobacco and Firearms."  *Mason*, 611 F.2d at 52 (emphases added).  Given its prior discussion of *Bell*, and the application of the rule of lenity to resolve doubt "against turning a single transaction into multiple offenses[,]" as well as its conclusion that the statutory language was ambiguous, the following discussion of the Act's administration only bolstered the Court's holding that it had already made clear.  *Id.* at 51.

B.

Neither the legislative history, nor our case law following *Mason*, serve to clarify § 1001(a)(2)'s ambiguity.  In 1996, Congress amended the statute to cover "any . . . statement or representation," 18 U.S.C. § 1001(a)(2) (1996)—in the singular—as opposed to its former version covering "any . . . statements or representations," 18 U.S.C. § 1001 (1948).  This revision fails to explain Congress's intent regarding the unit of prosecution, because the terms "statement" and "representation" do not carry the same definition.  *See*

10

*Statement*, Oxford English Dictionary (3d ed. 2012), https://www.oed.com/view/Entry/189259 (last visited November 28, 2022) (defining "statement" as "[a] formal written or oral account of facts, theories, opinions, events . . . as requested by authority"); *Representation*, Oxford English Dictionary (3d ed. 2009), https://www.oed.com/view/Entry/162997 (last visited November 28, 2022) (defining "representation" as "[t]he action of standing for, or in the place of, a person, group, or thing, and related senses" or "[a] depiction or portrayal of a person or thing").

Although a statement may be a representation, a representation is not necessarily a statement. Thus, there is no need to interpret the statute's terms as one referring to a single assertion, and the other to a series of assertions, in order to avoid rendering the statute's language superfluous. And while Congress's revision, amending § 1001(a)(2) to cover "any . . . statement or representation" in the singular, supports a finding that the statute is broad enough to encompass a single interview that only included one false statement, it does little to show that Congress *unambiguously* intended the unit of prosecution to be each individual statement made during one interview. Instead, the statute remains ambiguous because one could easily interpret § 1001(a)(2)'s unit of prosecution as one single interview or form. Under this view, the statute could be interpreted as characterizing Smith's entire interview as a "statement or representation," sufficient to support one count of making a false statement in violation of § 1001(a)(2).

In its attempt to declare § 1001(a)(2) unambiguous, the dissent relies upon an unpublished case decided after *Mason*. *See* Dissenting Op. at 38–39. In *Jameson*, we upheld the defendant's four convictions under § 1001(a)(2) and determined that "each

nonidentical false statement made may be charged as a separate violation of section 1001."

*See United States v. Jameson*, Nos. 91-5848, 91-5849, 91-5876, 1992 WL 180146, at *9 (4th Cir. July 29, 1992) (per curiam). The defendant's false statements there stemmed from two separate forms, one form submitted on September 15, 1987, and the second form submitted on September 7, 1988. On both forms, the defendant falsely denied (1) having any additional "creditors other than those providing conventional loans," and (2) possessing "interests in real property other than his personal residence." *Id.*

Declining to find his charges as multiplicitous, we reasoned that the questions on the two forms were not identical because they concerned the defendant's debt and property as of two different dates. We also found that the defendant could be charged with two counts per form because the government had to prove different facts for each count.[5] While Smith's challenge is more difficult to square with our unpublished decision in *Jameson*, the differing facts that the government had to prove to sustain each charge there render *Jameson* distinguishable from this case.

Unlike the differing types of documents that would be required to prove an individual's debt and specific property interests, the government proved Counts One and

---

[5] For support, we discussed the Supreme Court's decision in *United States v. Blockburger*, holding that "the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." 284 U.S. 299, 304 (1932). The defendant in *Blockburger*, however, was charged under two "*distinct* statutory provisions" and "[e]ach of the offenses created requires proof of a different element." *Id.* at 304. Because the defendant's one sale violated two sections of the same act, the Court upheld the defendant's judgment. *Id.* at 304. *See United States v. Mier-Garces*, 976 F.3d 1003, 1012–13 (10th Cir. 2020) (explaining that the *Blockburger* test applies "[w]hen the government charges a defendant under *separate statutes* for the same conduct").

Two by solely relying on the communications between its informants and Smith. The government had to prove that Smith "discussed his desire and plans to travel to Syria in support of ISIS with The Source[,]" J.A. 20, under Count One, and that Smith "had discussed with The Source the travel plans of a person that he [SMITH] believed to be a person who wanted to travel and assist ISIS[,]" J.A. 21, under Count Two. Thus, the FBI's evidence for both counts depended on its informants' conversations with Smith. It is also worth noting that while some of our sister circuits have defined § 1001(a)(2)'s unit of prosecution as a single statement, none of them have done so in a case where the government's evidence was so similar in substance. *See United States v. Meuli*, 8 F.3d 1481, 1485–86 (10th Cir. 1993) (involving a defendant who made false statements on multiple forms); *United States v. Segall*, 833 F.2d 144, 146–48 (9th Cir. 1987) (affirming the defendant's conviction on three counts of making a false statements on two separate dates); *United States v. Guzman*, 781 F.2d 428, 432–33 (5th Cir. 1986) (affirming the defendant's conviction on two counts under § 1001 for falsely representing her name on two separate documents).

In sum, we find ambiguity in Congress's intended unit of prosecution in § 1001(a)(2) following *Mason*. Because nothing in our case law nor the relevant legislative history serves to clarify this ambiguity, we apply the rule of lenity and reverse the district court's denial of Smith's motion to dismiss Count Two. *See Santos*, 553 U.S. at 519 ("We interpret ambiguous criminal statutes in favor of defendants, not prosecutors."); *see also Bell*, 349 U.S. at 81 ("When Congress leaves to the Judiciary the task of imputing to Congress an undeclared will, the ambiguity should be resolved in favor of lenity.").

13

III.

We turn next to Smith's challenge to the sufficiency of the evidence.  Smith claims that the district court erred in denying his motion for a judgment of acquittal on both false-statement counts.  We disagree.

Rule 29 requires a trial court, on the defendant's motion, to "enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  We review the district court's denial of a Rule 29 motion de novo. *United States v. Burfoot*, 899 F.3d 326, 334 (4th Cir. 2018).  In doing so, "we view the evidence in the light most favorable to the prosecution and decide whether substantial evidence . . . supports the verdict." *United States v. Walker*, 32 F.4th 377, 397 (4th Cir. 2022) (cleaned up).  "Substantial evidence" is evidence that a reasonable fact-finder could accept as adequate and sufficient to support a defendant's guilt beyond a reasonable doubt. *See id.*  Defendants bear a "heavy burden" under this standard. *Id.* (cleaned up).

"A § 1001 false-statement conviction requires (1) a false statement in a matter involving a government agency, (2) made knowingly [and] willfully, that is (3) material to the matter within the agency's jurisdiction." *United States v. Legins*, 34 F.4th 304, 313 (4th Cir. 2022).  Smith's challenge to his Count One conviction spans each element.   On Count Two, he contests only falsity and materiality.  We address each count in turn.

A.

On Count One, Smith contends that the government failed to prove he knowingly made a materially false statement.  Count One charged him with "falsely stating to FBI

14

Special Agents . . . that he had never discussed his desire or plans to travel to Syria." J.A. 20.

Smith first claims we must vacate this conviction because his responses to the FBI's imprecise questions were truthful. He next argues that the government failed to prove that he acted with the requisite intent because no expert testified to the meaning of Smith's Arabic statements. And last, Smith contends that, even if he knowingly and willfully made false statements, those statements were immaterial to the FBI's near-completed investigation. We disagree, finding sufficient evidence supports the jury's verdict on Count One.

1.

Smith's challenge to falsity revolves around Godfrey's questions, which are reproduced in the indictment:

1. "[H]ave you ever talked with anyone about . . . that you expressed to someone that you want to go to Syria and fight?"

2. "[H]ave you ever . . . talked with anyone that you wanted to go to Syria and join ISIS?"

J.A. 18. According to the indictment, Smith's responses to these questions were false given his discussions with Khalid about traveling to Syria.

Smith insists he truthfully answered both questions in the negative. The first question, Smith says, is phrased so ambiguously that he interpreted it to ask whether he had talked with anyone about having expressed to anyone else that he wanted to go to Syria. And the second question is "similarly imprecise," Smith claims, because it asks "whether

15

[he had] engaged in a conversation with a person, [whom he] thought should go to Syria and join ISIS." Appellant's Br. at 47.

Smith's contentions turn on the literal-truth defense set forth in *Bronston v. United States*, 409 U.S. 352 (1973). In *Bronston*, the Supreme Court held that an individual isn't guilty of perjury when his allegedly false answer was "literally true but not responsive to the question asked and arguably misleading by negative implication." 409 U.S. at 353.

Underlying this doctrine is the notion that "[t]he burden is on the questioner to pin the witness down to the specific object of the questioner's inquiry." *Id.* at 360. And if a response is evasive, it's the questioner's duty "to spot that evasion and to flush out the whole truth." *United States v. Earp*, 812 F.2d 917, 919 (4th Cir. 1987) (cleaned up). Though *Bronston* dealt with a perjury charge, we've since applied its holding to § 1001 offenses. *See United States v. Good*, 326 F.3d 589, 592 (4th Cir. 2003).

But as we've explained, the literal-truth defense is "a narrow one." *United States v. Sarwari*, 669 F.3d 401, 406 (4th Cir. 2012). "It applies only where a defendant's allegedly false statements were *undisputedly* literally true." *Id.* (cleaned up). And fatally for Smith, it doesn't "apply in cases in which the focus is on the ambiguity of the question asked. Nor does it apply to an answer that would be true on one construction of an arguably ambiguous question but false on another." *Id.* (cleaned up).

That Smith can construe either question as ambiguous therefore doesn't help him. There's no doubt Godfrey could have chosen his words more carefully. Still, Godfrey testified that he asked Smith "about whether or not [Smith] had expressed any plans or desire, intentions[,] or aspirations to go to Syria," which Smith denied. J.A. 799. A

16

reasonable jury could conclude that (1) Godfrey intended to ask Smith about his discussion of his personal desire to travel to Syria, and (2) Smith understood as much. *See United States v. Purpera*, 844 F. App'x 614, 632 (4th Cir. 2021) (finding an investigator's testimony sufficient for a reasonable jury to resolve against the defendant an "ambiguity surrounding the precise nature of [the investigator's] question").

Thus, Smith's response to the second question is enough to support falsity. When Godfrey asked whether Smith had ever "talked with anyone that [he] wanted to go to Syria and join ISIS," Smith replied, "No, we've talked – I talk to numerous – you have to understand the Muslim community. There's so much stuff going on now in the Muslim community with everything." J.A. 798.

Smith answered Godfrey's second question with "[n]o." The rest of his response, even if true, doesn't retract his initial denial. A rational jury could thus find Smith falsely denied discussing his desire to travel to Syria.

Even so, Smith suggests that his answer to Godfrey's first question, under any construction, was either nonresponsive or true. While we need not reach this contention, we reject it all the same.

Smith says his response to the first question was literally true because he told Godfrey he "never had any *plans* to go [to Syria] and do anything." Appellant's Br. at 46 (cleaned up) (emphasis added). Smith contends that, when he said he had no "plans" to go to Syria, he meant he had no "detailed proposal" to go, rather than no "intention or decision" to do so. Appellant's Br. at 46 (quoting Oxford Dictionary of English (3d ed. 2010)). He argues that his intended definition of "plans" makes his response literally true.

17

Smith relies on our precedent in *United States v. Hairston*, 46 F.3d 361 (4th Cir. 1995). There, we reversed a perjury conviction where the context made it "obvious" that a defendant used a different definition of "prepare" and "preparation" than that employed by the prosecutor, rendering her statements literally true. *Id.* at 375–76. We face no such quandary here.

First, Godfrey didn't use the word "plans," so there was no disconnect between the question and answer as in *Hairston*. Second, it's not obvious which definition Smith intended. And third, even accepting Smith's premise, the jury had substantial evidence to reasonably conclude that Smith's "plans" to go to Syria constituted a "detailed proposal." After all, Smith discussed with Khalid his desire to go to Syria and his idea to finance that trip by working with Bilal. So a reasonable jury could find Smith lied when answering Godfrey's first question.

2.

Smith next argues that the government failed to prove he knowingly and willfully made false statements. In conversations with Khalid discussing travel to Syria and joining ISIS, Smith often responded in Arabic, saying "inshallah" or "na'am." Khalid, fluent in Arabic, told the jury that he understood those words as affirmations to his questions.

Smith now contends that because the government didn't present expert testimony on Arabic, the jury didn't have "sufficient evidence to interpret" his responses. Appellant's Br. at 50. So, says Smith, the jury couldn't conclude what he "actually meant when he said [those] words." *Id.*

18

The problem for Smith is that the jury heard sufficient evidence of his conversations with Khalid *in English* to conclude that Smith knowingly and willfully lied to the FBI. For example, when they first met, Smith told Khalid, "There is a particular family in Syria . . . that I went there one time before to visit. . . . I want to go back to them." S.J.A. 1–2. And in their third meeting, Khalid asked Smith, "[W]hat's your plans [sic] for Syria," to which Smith responded, "I need to get the money to get there . . . and that's what we're working on so I can have the money to get there." S.J.A. 37. To that end, the jury heard that Smith worked with Bilal to earn money for his trip.

We thus find that the government presented enough direct and circumstantial evidence for a reasonable jury to conclude that Smith acted with the requisite intent when he denied ever discussing his desire or plans to travel to Syria. *See United States v. Dennis*, 19 F.4th 656, 665 (4th Cir. 2021) (In reviewing the denial of a Rule 29 motion, "[w]e must consider both circumstantial as well as direct evidence.").

### 3.

Smith also challenges the materiality of his untruthful responses. According to Smith, denying his travel plans couldn't have affected the FBI's actions. Smith says his interview was a "Hail Mary" at the end of the investigation and that the FBI already knew the answers to its questions. Appellant's Br. at 42. We reject this contention.

"A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998) (cleaned up). The government "must prove materiality by reference to the particular government agency or public officials that were

19

targeted"—here, the FBI. *United States v. Raza*, 876 F.3d 604, 617 (4th Cir. 2017). This inquiry is ultimately "an objective test." *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012). It's irrelevant "whether the false statement *actually influenced* the [FBI's] decision-making process." *Id.* (emphasis added).

Smith's denials of his travel plans to Syria were material to the FBI's investigation. As Godfrey told the jury, the FBI began investigating Smith because the agency was "very concerned that he may be going [to Syria] to join ISIS." J.A. 495. Smith's denials that he discussed the very plans which prompted the FBI's inquiry, if believed, "were capable of influencing the direction of the investigation." *United States v. Barringer*, 25 F.4th 239, 251 (4th Cir. 2022) (cleaned up). These "misrepresentations, under normal circumstances, could cause FBI agents to re-direct their investigation to another suspect, question their informant differently or more fully, or perhaps close the investigation altogether." *United States v. McBane*, 433 F.3d 344, 352 (3d Cir. 2005). That's enough to satisfy our review.

Smith's claims to the contrary miss the mark. Even if the FBI's interview was (as Smith puts it) a "Hail Mary," a reasonable jury could find that Smith's false statements were *capable* of influencing the FBI's still-active investigation. *See United States v. Fondren*, 417 F. App'x 327, 336 (4th Cir. 2011) (rejecting that "statements could not be material given that the [FBI's] investigation was essentially complete"). And that "the FBI investigators already knew the answers to the questions they asked him" makes no difference to our inquiry. *Id.* (collecting cases).

20

B.

In challenging his Count Two conviction, Smith narrows his focus to the falsity and materiality of his relevant statements. Count Two charged Smith with "falsely stating to FBI Special Agents . . . that he did not know that [Hilal] intended to use the buddy pass procured by [Smith] to travel and support ISIS." J.A. 21.

Smith's contentions here turn on one underlying fact—Hilal was a fictitious person invented by the FBI. Smith says he truthfully denied knowing Hilal's intentions because those intentions never existed. And denying knowledge about Hilal's intentions couldn't have influenced the FBI's decision-making, Smith claims, because his untruthfulness alone can't establish materiality. We reject these arguments.

1.

As before, we begin with Smith's falsity challenge. Smith reasserts a literal-truth defense. This time, he argues that denying knowledge of Hilal's intentions was truthful because he "could have no knowledge of a person who does not exist, nor could he know the intentions of a non-existent person." Appellant's Br. at 34. Smith's contention thus rises and falls with the meaning of "knowledge."

We recently explored this terrain, finding the term "knowledge" "broad and somewhat ambiguous." *Doe v. Fairfax Cnty. Sch. Bd.*, 1 F.4th 257, 266 (4th Cir. 2021). Though "knowledge" can mean "'[a]n awareness . . . of a fact or circumstance' or the 'condition of having information' about something," it can also signify "'a state of mind in which a person has no substantial doubt about the existence of a fact.'" *Id.* (quoting *Knowledge*, Black's Law Dictionary (11th ed. 2019); *Knowledge*, Merriam-Webster

21

Dictionary, https://www.merriam-webster.com/dictionary/knowledge).   The result is that "knowledge" can mean either an awareness of an objective truth *or* a person's subjective understanding of a thing.  *See id.*

Smith urges us to adopt the former meaning and ignore the latter.  But the literal-truth defense doesn't permit us to disregard one construction of an ambiguous question in favor of another.  *See Sarwari*, 669 F.3d at 407.  Godfrey asked Smith whether he "knew" that Hilal was planning to use the buddy pass to travel to Syria and join ISIS.  S.J.A. 81 at 2:04:40–2:05:20.  A reasonable jury could decide, upon hearing the full interview, that Godfrey's question went to Smith's subjective understanding of Hilal's intentions, rather than an awareness of the objective truth of those plans.  So Smith's defense fails here, too.

Smith disputes this conclusion, pointing us to the Third Circuit's decision in *United States v. Castro*, 704 F.3d 125 (3d Cir. 2013).  In *Castro*, our sister court vacated a defendant's § 1001 conviction for lying to FBI agents about receiving extorted funds.  *See id.* at 139–41.  The defendant had unwittingly hired FBI agents posing as "debt collectors" to coerce a former business partner into repaying an investment in a failed venture.  *Id.* at 130.  Though the defendant accepted purportedly extorted money from the collectors, he later denied ever receiving any payment from his old partner.  *Id.* at 132.

The court found this denial was "completely, if unintentionally, accurate."  *Id.* at 139.  It was undisputedly true that the defendant never received any money from his partner—it came from the FBI.  *See id.* at 140.  Whether he "subjectively believed he was lying" made no difference, the court said, because "our legal system does not convict people of being bad."  *Id.*

22

We find *Castro* inapt to Smith's case. The issue of falsity in *Castro* turned on the source of a payment. Here, the falsity of Smith's statements turns on his state of mind—more specifically, his understanding of Hilal's travel plans. On that point, the government offered ample evidence.

Khalid asked Smith to buy the buddy pass for Hilal because Hilal intended to fly from Florida to New York and eventually make his way to "you know where," meaning Syria. J.A. 708. Khalid also described how he told Smith that Hilal was "very important for us," meaning ISIS. J.A. 708. The jury was free to disbelieve Khalid's account having heard all the recorded exchanges, but its determination is not for us to question. *See United States v. Wilson*, 484 F.3d 267, 283 (4th Cir. 2007) ("If the evidence supports different, reasonable interpretations, the jury decides which interpretation to believe." (cleaned up)).

In short, substantial evidence supports the jury's finding of falsity on Count Two.

2.

Smith next contends that the government failed to prove the materiality of his false statements denying knowledge of Hilal's travel plans.

The government again relied on Godfrey's testimony to establish this element. Godfrey explained that he asked the Hilal-related questions because the FBI needed to establish "a baseline of truth" with Smith for additional questioning on the buddy pass. J.A. 801. The FBI wanted to learn more about the involvement of Smith's wife and the person who had lent his credit card to buy Hilal's plane ticket. The FBI didn't know whether that other person was someone "whose ideology was aligned with ISIS" or just an "unwitting accomplice." J.A. 802.

23

But each question Godfrey asked risked revealing more of the FBI's working knowledge gained in the investigation. In turn, sharing that knowledge with Smith could have compromised its investigation because Smith might have disclosed it to persons of interest. Once Smith lied about knowing Hilal's travel plans, Godfrey didn't think it worthwhile to compromise the FBI's investigation in return for more untruthful answers.

Smith dismisses this theory and its supporting evidence, arguing that his credibility alone could never be material to the FBI's investigation, particularly where his untruthful statements were based on the agency's own made-up narrative. To permit a finding of materiality on these facts, Smith says, "is to eliminate [that] requirement altogether and transform nearly any false statement into a material one." Appellant's Br. at 24.

But it bears emphasizing that a false statement is material under § 1001 when it has "a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *Hamilton*, 699 F.3d at 362 (cleaned up). The Supreme Court has explained that a jury, before applying this legal standard, must first make two factual findings: the defendant's relevant statement and the decision the government agency was trying to make. *See United States v. Gaudin*, 515 U.S. 506, 512 (1995). Considering this framework, we're satisfied that a rational jury could find Smith's false statements about Hilal material to the FBI's investigation.

Here, the FBI wasn't only trying to discern whether Smith intended to provide material support to a terrorist organization. The agency was also trying to understand what role Smith's wife and the credit-card owner had in the apparent scheme. So the FBI's decision-making at this stage encompassed its investigation into the conduct of Smith, his

24

wife, and the other person participating in Smith's activities. *See Fondren*, 417 F. App'x at 335.

From there, we think it plain that Godfrey's testimony adequately supports the jury's materiality finding. The FBI had to make a cost-benefit assessment during Smith's interview—how much of its investigation was it willing to compromise and what information would it receive in return. Smith's false statements on the buddy pass influenced that assessment by informing the FBI what lines of questioning might be fruitful. For instance, the FBI decided that Smith wasn't a viable source to investigate the person who purchased the buddy pass. But had the FBI believed Smith truthfully answered its Hilal-related questions, a reasonable jury could accept Godfrey's testimony as proof that the FBI might well have questioned Smith differently, potentially changing the course of the investigation.

Taking the evidence in the light most favorable to the government, as we must, Smith's false answers "were capable of influencing the direction of the investigation." *Barringer*, 25 F.4th at 251 (cleaned up); *cf. Sarihifard*, 155 F.3d at 307 ("[E]ven if a grand jury disregards a witness's false testimony, the false testimony may impede the grand jury's capacity to attain an accurate and prompt resolution of the matter under consideration.").

In concluding as much, we reject Smith's contention that his credibility alone could never be material to the FBI's investigation. The Supreme Court, in assessing § 1001, has held that "the investigation of wrongdoing is a proper governmental function; and since it is the very purpose of an investigation to uncover the truth, any falsehood relating to the

25

subject of the investigation perverts that function." *Brogan v. United States,* 522 U.S. 398, 402 (1998) (emphasis omitted).

So too here. At its core, the FBI's purpose was to discover the truth underlying Smith's potentially criminal enterprise. Smith's false statements thus weren't harmless lies told in a vacuum; they related to other subjects of the FBI's investigation. Under such circumstances, we conclude that Smith's answers—though revealing only his untruthfulness—could alter the FBI's decision-making.[6] *See United States v. Lupton*, 620 F.3d 790, 806–07 (7th Cir. 2010) ("When statements are aimed at misdirecting agents and their investigation, even if they miss spectacularly or stand absolutely no chance of succeeding, they satisfy the materiality requirement of 18 U.S.C. § 1001.").

The Supreme Court's decision in *Kungys v. United States*, 485 U.S. 759 (1988), doesn't change our conclusion. There, the Court addressed materiality under 8 U.S.C. § 1451(a), which provides for the denaturalization of citizens whose citizenship was "illegally procured or [was] procured by concealment of a material fact or by willful misrepresentation." *Id.* at 764 n.1 (cleaned up). The government had argued that the defendant's false statements in his visa and naturalization applications disqualified him from citizenship. *See id.* at 764–65. It said that § 1451(a)'s misrepresentation clause and "illegally procured" clause both applied—the latter because the defendant's false statements rendered him ineligible for a good-moral-character finding (a requirement for

---

[6] For these reasons, we likewise reject Smith's assertion that his lies couldn't influence the FBI's investigation because the agency fabricated the facts underlying his false statements.

naturalization) under 8 U.S.C. § 1101(f)(6). *See id.* The Third Circuit agreed only on the former point, finding the defendant made material misrepresentations. *Id.* at 766.

In reversing and remanding for reconsideration, the Supreme Court clarified that courts should apply § 1001's materiality standard—and no other formulation—to § 1451(a)'s misrepresentation clause. *See id.* at 769–72. The Court then declined to reach the government's alternate basis for affirming under § 1451(a)'s "illegally procured" clause for violation of § 1101(f)(6), which bars a finding of good moral character if a person gives "false testimony" to obtain immigration benefits. *Id.* at 779. It addressed only the Third Circuit's conclusion that false testimony under § 1101(f)(6) had to be material. *See id.* Unlike § 1451(a)'s misrepresentation clause, the Court said, § 1101(f)(6) has no such materiality requirement. *Id.* The Court explained the divergence between the statutes not just by their plain language but also by their purposes: § 1451(a)'s to prevent "false pertinent data from being introduced into the naturalization process," and § 1101(f)(6)'s to "identify a lack of good moral character." *Id.* at 780.

Smith suggests that the *Kungys* court's disparate treatment of false statements under those statutes highlights the insufficiency of untruthfulness alone as proof of materiality. He argues that our interpretation of materiality reduces § 1001(a)(2) to a good-moral-character provision like § 1101(f)(6).

Smith is wrong. For one, the *Kungys* majority didn't answer whether the defendant's untruthfulness was material to his procurement of citizenship, as § 1451(a) requires. *See id.* at 767–72. But even if a defendant's untruthfulness alone couldn't possibly influence the government's naturalization decision, an ongoing criminal

27

investigation presents a far different inquiry. As we've outlined, our focus is on the particular agency to which a defendant lied—*see Raza*, 876 F.3d at 617—and any falsehood going to the heart of an FBI investigation can influence it. *See Brogan*, 522 U.S. at 402.

A final point. Smith complains that the FBI's pertinent decision must be more than just "the decision to ask more questions." Appellant's Br. at 25–26. He warns that, if we sanction this theory, FBI agents will always be able to advance after-the-fact justifications in service of materiality. Not so. Our precedent has long held that the government must offer sufficient evidence to prove materiality (as it did here). *See United States v. Ismail*, 97 F.3d 50, 61 (4th Cir. 1996). That's an adequate safeguard against theories premised on an agency's afterthoughts.[7]

In sum, we conclude that Smith's false statements denying his knowledge of Hilal's travel plans could have influenced the FBI's investigation. So they were material.

## IV.

Smith also contends that one of the district court's instructions and an unrelated comment during trial allowed the jury to convict him without determining whether his

---

[7] Because a defendant may invoke his right to remain silent in an FBI interview, Smith also argues it is "entirely speculative" for a jury to conclude how the investigation would have proceeded had he been truthful. Appellant's Br. at 25. Of course, if Smith had remained silent or told the truth, there would be no materiality inquiry as there would be no crime. In any event, Smith ignores that our focus is on his false statements' *potential* to alter the FBI's investigation. *See Barringer*, 25 F.4th at 251 ("Whether the false statement actually influenced an agency's action is irrelevant.").

28

statements were false. Because Smith didn't object to the instruction or the comment, we review for plain error. *See United States v. Hope*, 28 F.4th 487, 493 (4th Cir. 2022). These claims, however, are meritless.

Smith first challenges the court's jury instruction that "the government is lawfully permitted to use decoys and deception to conceal the identity of its informants." J.A. 982. While Smith characterizes this instruction as misleading, he doesn't dispute that it's a correct statement of the law. So the court appropriately instructed the jury as much. *See United States v. Hurwitz*, 459 F.3d 463, 474 (4th Cir. 2006) ("We review a jury instruction to determine whether, taken as a whole, the instruction fairly states the controlling law." (cleaned up)).

Second, the court stated in response to an objection, that "we have two counts of a violation of 1001, which indicate that there were . . . two falsehoods here." J.A. 835. Smith argues this statement misled the jury to believe the government had established those two falsehoods. But context proves otherwise. Shortly after, the court said, "The question is, were these two lies told or not?" J.A 835. And the court fully instructed the jury on the elements of a § 1001(a)(2) offense, including falsity. We find no error here, much less a plain one.

V.

We now address the district court's refusal to give the jury an entrapment instruction. We review a district court's decision to give (or not give) a jury instruction for abuse of discretion. *See United States v. Hassler*, 992 F.3d 243, 246 (4th Cir. 2021).

29

"[A] valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States*, 485 U.S. 58, 63 (1988).  To establish inducement, "a defendant must show that the government acted in an excessive manner that would prompt a reasonably firm person to commit a crime." *Sarihifard*, 155 F.3d at 308.  Only when a defendant makes this prima facie showing does the burden shift to the government to prove the defendant's predisposition to the criminal conduct.  *United States v. Young*, 916 F.3d 368, 375–76 (4th Cir. 2019).

But "[t]he district court is the gatekeeper." *United States v. Hackley*, 662 F.3d 671, 681 (4th Cir. 2011).  If a defendant can't produce "more than a mere scintilla of evidence of entrapment, the court need not give the instruction." *Id.* (cleaned up).

In requesting an entrapment instruction, Smith argued that the government had induced him to lie to FBI agents by serving his wife with a subpoena.  At trial, Godfrey testified about these pressure tactics on Smith's wife.  Godfrey had called her "the weakest link," and he told the jury about the FBI's plan to use her to get to Smith.  J.A. 590.  To execute this plan, Godfrey approached Smith's wife for an interview at her job, and he had the grand jury subpoena delivered to her mother's house.

The district court declined Smith's request for an instruction, concluding he hadn't shown "an inducement to commit perjury." J.A. 923.  The court explained that there was no evidence that the FBI subpoenaed Smith's wife to "get him to come down" and lie to agents. J.A. 923.  That decision, the court reasoned, was Smith's alone.

30

We see no abuse of discretion.  Smith offered no evidence to suggest the FBI induced him into *lying*, even if the agency aimed to get him in the hot seat.  *See United States v. Russell*, 411 U.S. 423, 436 (1973) ("It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play.").

Godfrey warned Smith at the outset of the interview that the only way he could "create any possible problems" was by "being deceptive or untruthful."  S.J.A. 81 at 1:24:00–1:24:15.  Godfrey even gave Smith a copy of § 1001's text during the interview—before the Hilal questions—informing him that lying to the FBI was a criminal offense.

The FBI's repeated efforts to ensure Smith told the truth belie any claim that agents coaxed him into lying.  *See United States v. Kennedy*, 372 F.3d 686, 698 (4th Cir. 2004).  And the mere fact that agents knew Smith might lie about Hilal's travel plans after falsely denying his own doesn't amount to inducement.  *See Sarihifard*, 155 F.3d at 308–09.

VI.

Finally, Smith maintains that his sentence is procedurally unreasonable because the district court erroneously imposed the terrorism enhancement under U.S.S.G. § 3A1.4.  "Application of the terrorism enhancement provides a twelve level enhancement—and an automatic criminal history category of VI—when 'the offense is a felony that involved, or was intended to promote, a federal crime of terrorism.'"  *United States v. Chandia*, 514 F.3d 365, 375 (4th Cir. 2008) (quoting U.S.S.G. § 3A1.4).  In turn, a "federal crime of terrorism" has two elements: (1) "the commission of one of a list of specified felonies";

31

and (2) "a specific intent requirement, namely, that the underlying felony was calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." *Id.* (cleaned up).

Smith claims the district court erred in applying the terrorism enhancement because it failed to expressly find specific intent. Indeed, our precedent compels a district court to identify the evidence underpinning its specific-intent finding when "the basic facts supporting the conviction do not give rise to an automatic inference of the required intent." *Id.* at 376.

But we need not delve into this question given that we're remanding for resentencing because of the district court's error on multiplicity. On remand, the district court can address the merits of Smith's claim regarding the terrorism enhancement.

## VII.

In sum, we reverse the district's denial of Smith's motion to dismiss Count Two of the indictment as multiplicitous, vacate the judgment, and remand for resentencing. We otherwise affirm.

*AFFIRMED IN PART, REVERSED IN PART,*
*VACATED AND REMANDED FOR RESENTENCING*

32

TOBY HEYTENS, Circuit Judge, concurring:

As the Court explains, the theory of entrapment Smith presented here is insufficient to state a prima facie case of inducement and thus provides no basis for overturning Smith's convictions. I write separately to note that Smith may have been able to establish a valid entrapment defense under a different theory—and to caution that similar government conduct may not be countenanced in future cases.

I.

It is well established that the government may "use undercover agents to enforce the law" and "afford opportunities or facilities for the commission of [an] offense." *Jacobson v. United States*, 503 U.S. 540, 548 (1992). In doing so, however, the government "may not originate a criminal design, implant in an innocent person's mind the disposition to commit a criminal act, and then induce commission of the crime so that the Government may prosecute." *Id.*

These principles apply equally to prosecutions under 18 U.S.C. § 1001. In *Brogan v. United States*, 522 U.S. 398 (1998), the Supreme Court rejected the "exculpatory no" defense, under which some courts had carved out an exception to criminal liability under Section 1001 "for a false statement that consists of the mere denial of wrongdoing." *Id.* at 399. "Whether or not the predicament of the wrongdoer run to ground tugs at the heartstrings," the Court explained, "neither the text nor the spirit of the Fifth Amendment confers a privilege to lie." *Id.* at 404. At the same time, however, the Court emphasized that "background interpretive principle[s] of general application"—including that criminal

33

statutes do not "cover violations produced by entrapment"—remain applicable in Section 1001 prosecutions. *Id.* at 406.

In a separate opinion, Justice Ginsburg underscored the importance of these principles. As she noted, Section 1001 "arms Government agents with authority not simply to apprehend lawbreakers, but to generate felonies, crimes of a kind that only a Government officer could prompt." *Brogan*, 522 U.S. at 409 (Ginsburg, J., concurring in the judgment). In particular, "the sweeping generality of § 1001's language" creates the risk "that an overzealous . . . investigator—aware that a person has committed some suspicious acts, but unable to make a criminal case—will create a crime by surprising the suspect, asking about those acts, and receiving a false denial." *Id.* at 416.

## II.

The facts of this case appear to implicate Justice Ginsburg's concerns. Smith initially drew the FBI's attention because he had expressed interest in traveling to Syria. Yet simply going to Syria—even with the intent to participate in jihad against Bashar al-Assad's regime—is not a federal crime, and Smith's early conversations with the government's primary informant referenced entities not designated as foreign terrorist organizations. Cf. 18 U.S.C. § 2339B (making it a crime to "knowingly provide[ ] material support . . . to a foreign terrorist organization, or attempt[ ] . . . to do so"). ISIS, of course, is a designated foreign terrorist organization. See 79 Fed. Reg. 27972 (May 15, 2014); 8 U.S.C. § 1189(a)(2)(A)(ii), (B)(i). But it was a government-compensated informant, not Smith, who first mentioned ISIS—to the point of making Smith swear allegiance to ISIS as a condition of assisting with Smith's otherwise lawful aim of traveling to Syria. And, in

any event, the government never charged Smith with actually providing (or attempting to provide) material support to ISIS.

The government, however, had another route to secure a conviction. Beyond requiring Smith to swear allegiance to ISIS, the government's primary informant did something else: He told Smith not to tell anyone about their conversations about ISIS. See, *e.g.*, SJA 16 ("ABU KHALID: . . . keep yourself down . . . don't talk to nobody about this."). And then, during a later interview, FBI agents asked Smith about the very conversations and topics the informant had directed Smith not to disclose. Consistent with the informant's advice, Smith falsely denied having spoken with any of the government's informants about traveling to Syria to join ISIS. And, with that, the government finally had a crime: making false statements, in violation of 18 U.S.C. § 1001.

In this case, therefore, the government was not merely "aware that [Smith] ha[d] committed some suspicious acts." *Brogan*, 522 U.S. at 416 (Ginsburg, J., concurring in the judgment). Instead, it might have been argued that by having one government agent (an undisclosed confidential informant) raise the topic of ISIS and urge Smith not to disclose those conversations to anyone, and then having another set of government agents (the FBI) ask Smith about those very same conversations, the government "originate[d] a criminal design" and "implant[ed] in an innocent person's mind the disposition to commit a criminal act." *Jacobson*, 503 U.S. at 548.

This combination of circumstances might have distinguished Smith's case from others where we have not found an entrapment instruction necessary. In *United States v. Sarihifard*, 155 F.3d 301 (4th Cir. 1998), for example, this Court concluded an entrapment

defense would have failed where "there [was] no evidence suggesting that the government's *purpose* in questioning the defendant was the solicitation of perjured testimony." *Id.* at 308 (emphasis added). Here, in contrast, a jury might have been able to find that when FBI agents asked Smith about matters the government's own informant had instructed Smith not to disclose to anyone, their purpose was to get Smith to lie and then convict him for having done so.[*]

Smith, however, has not claimed that the government's undisclosed confidential informant—rather than the fully disclosed FBI agents—induced him to commit the crime of lying to the FBI. For that reason, we need not decide whether the informant's actions could have given rise to a valid entrapment defense, and I concur in the Court's decision rejecting the argument presented here.

---

[*] A valid entrapment defense also requires "a lack of predisposition on the part of the defendant to engage in the criminal conduct." *United States v. Blevins*, 960 F.2d 1252, 1257 (4th Cir. 1992). Here too, the record suggests Smith might have had a colorable claim. Consider, for example, Smith's willingness to voluntarily talk to the FBI, truthfully offer up names and descriptors of the informants, and describe his and his wife's roles in buying the airline's discounted buddy pass.

DIAZ, Circuit Judge, dissenting in part:

I join all but Part II of the Court's opinion. In my view, the district court correctly denied Smith's motion to dismiss Count Two as multiplicitous.

"When a defendant is charged with multiple violations of the same statute arising from the same course of conduct, the court must consider '[w]hat Congress has made the allowable unit of prosecution.'" *United States v. Shrader*, 675 F.3d 300, 313 (4th Cir. 2012) (quoting *Bell v. United States*, 349 U.S. 81, 81 (1955)). This inquiry asks us to "look to the language of the statute, being mindful that any ambiguity must be resolved in favor of the defendant under the rule of lenity." *Id.* (cleaned up). Whether two counts are multiplicitous is a question of law we review de novo. *Id.*

Section 1001 punishes, in part, "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes any materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001(a)(2). At bottom, § 1001(a)(2) defines the crime (and so the unit of prosecution) in terms of a single statement or representation. *See United States v. Dunford*, 148 F.3d 385, 389 (4th Cir. 1998) (explaining that, under a literal construction, "any" in the context of a singular noun means a "single" item).

Section 1001's legislative history supports this construction. Originally, § 1001 prohibited false "statements or representations." 18 U.S.C. § 1001 (1948). But Congress revised the statute to take on a singular form, now prohibiting any false "statement or representation." 18 U.S.C. § 1001(a)(2) (1996). Thus, each nonidentical statement or representation (not each interview) is the unit of prosecution.

37

True, the terms "statement" and "representation" can accommodate either a single assertion or a series of the same. *See Statement*, Oxford English Dictionary (3d ed. 2012), https://www.oed.com/view/Entry/189259 (last visited November 28, 2022) (defining "statement" as both "[a] formal written or oral account of facts" and "[a]n expression of something . . . a declaration, an assertion"); *Representation*, Oxford English Dictionary (3d ed. 2009), https://www.oed.com/view/Entry/162997 (last visited November 28, 2022) (defining "representation" as "a spoken or written statement"). But "we disfavor interpretations of statutes that render language superfluous." *Alexander v. Carrington Mortg. Servs., LLC*, 23 F.4th 370, 379 (4th Cir. 2022) (cleaned up). So these usually synonymous terms shouldn't carry the same meaning in § 1001—one should mean a single assertion, and the other, a series. I'm satisfied that Congress permitted the prosecution of either a single lie or a series of lies.[1]

The Supreme Court's test in *Blockburger v. United States* confirms our conclusion that each *nonidentical* false statement or representation may be prosecuted, asking "whether each [offense] requires proof of a fact which the other does not." 284 U.S. 299, 304 (1932); *see, e.g.*, *Shrader*, 675 F.3d at 314. Indeed, we have used this test once before in the § 1001 context, though in an unpublished decision. *See United States v. Jameson*, Nos. 91-5848, 91-5849, 91-5876, 1992 WL 180146, at *9 (4th Cir. July 29, 1992) (per curiam).

---

[1] Because both counts charged Smith with making a false statement *and* representation, I need not assign each term its corresponding definition.

38

In *Jameson*, we held that "each nonidentical false statement made may be charged as a separate violation." *Id.* (cleaned up).[2] Applying *Blockburger*, we reasoned that the government had to establish the falsity of two separate responses on a single form through different facts. *See id.* at *9–*10. So each nonidentical false response supported a separate § 1001 offense. *Id.* I find *Jameson*'s reasoning persuasive.

Here, the falsity of Smith's statements in Counts One and Two turned on proof of different facts. Count One required the government prove Smith lied about his own "desire or plans to travel to Syria." J.A. 20. For Count Two, the government had to prove that Smith lied about his knowledge of Hilal's travel plans. So each count required proof of Smith's understanding of different travel plans, confirming that his convictions aren't multiplicitous.

Our decision in *United States v. Mason*, 611 F.2d 49 (4th Cir. 1979), is not to the contrary. There, we concluded that 18 U.S.C. § 922(a)(6)'s prohibition on making "any false or fictitious oral or written statement" in connection with a firearm or ammunition sale presented an ambiguous unit of prosecution. *Id.* at 52 (cleaned up). We thus resolved § 922(a)(6)'s unit of prosecution in the defendants' case as a course of conduct rather than each false statement, dismissing their multiplicitous convictions. *See id.* at 52–53.

---

[2] Each circuit to address this question has arrived at the same conclusion. *See United States v. Meuli*, 8 F.3d 1481, 1485–86 (10th Cir. 1993); *United States v. Segall*, 833 F.2d 144, 146–48 (9th Cir. 1987); *United States v. Guzman*, 781 F.2d 428, 432–33 (5th Cir. 1986); *United States v. Anderson-Bagshaw*, 509 F. App'x 396, 411–13 (6th Cir. 2012); *United States v. Bustamante*, 248 F. App'x 763, 764–65 (8th Cir. 2007) (per curiam).

Acknowledging the similarity between the language in § 922(a)(6) and § 1001(a)(2), I nonetheless reach a different result here.

*Mason* dealt with two defendants' false denials of their felon status on multiple forms they submitted to a gun dealer when making multi-firearm purchases—one form for each gun. *See id.* at 50–51. Beyond § 922(a)(6)'s language, *Mason* relied on "the manner in which the Gun Control Act [had] been administered by the Bureau of Alcohol, Tobacco and Firearms." *Id.* at 52.

We found that the Bureau hadn't required multiple certification forms in a multi-firearm purchase—that discretion was left to the individual gun dealer. *See id.* at 52–53. Because "a particular gun dealer's practice shouldn't control the application of a federal criminal statute," we held each course of lying, not each lie, was the allowable unit of prosecution. *Id.* at 53. And "nothing in [§] 922(a)(6) or its legislative history" suggested that Congress intended otherwise. *Id.*

*Mason*'s reasoning doesn't control this case. For starters, the Gun Control Act's administration has no bearing here. There's no comparable administration of § 1001(a)(2). But more importantly, § 1001's legislative history *does* suggest that Congress intended each individual, nonidentical false statement to be the unit of prosecution.

Accordingly, the district court correctly denied Smith's motion to dismiss Count Two as multiplicitous. Because my colleagues hold otherwise, I respectfully dissent.

40