**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 22-4113

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

WILLIAM S. WILSON, a/k/a Bill,

    Defendant - Appellant.

_____

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria.  Liam O'Grady, Senior District Judge.  (1:17-cr-00222-LO-1)

_____

Submitted:  October 11, 2023                    Decided:  December 12, 2023

_____

Before AGEE, WYNN, and RICHARDSON, Circuit Judges.

_____

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion, in which Judge Agee and Judge Richardson joined.

_____

**ON BRIEF:** Andrew M. Stewart, DENNIS, STEWART & KRISCHER, PLLC, Arlington, Virginia, for Appellant.  Jessica D. Aber, United States Attorney, Aidan Taft Grano-Mickelsen, Assistant United States Attorney, Richmond, Virginia, Russell L. Carlberg, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

William Wilson appeals from his convictions and sentence for conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349, wire fraud in violation of 18 U.S.C. § 1343, false claims in violation of 18 U.S.C. § 287, bribery of a public official in violation of 18 U.S.C. § 201(b)(1)(A), and false statements in violation of 18 U.S.C. § 1001(a)(2).

On appeal, Wilson challenges the district court's declaration of a mistrial when he was first tried on these charges, arguing that the district court should have instead dismissed the indictment against him. He also challenges the sufficiency of the evidence supporting his convictions, the district court's answer to a set of questions from the jury, and the district court's application of three sentencing enhancements. For the reasons that follow, we affirm.

I.

We begin with Wilson's argument that, when the Government discovered near the close of his first trial that it had inadvertently failed to produce in discovery a large quantity of digital evidence, the district court erred by merely declaring a mistrial. In Wilson's view, the only suitable remedy for the Government's violation was dismissal of the indictment.

But while we agree with Wilson that the evidence should have been disclosed under *Brady v. Maryland*, 373 U.S. 83 (1963), our prior cases have consistently held that the proper remedy for a *Brady* violation is a mistrial, not dismissal. *See, e.g., United States v. Dyess*, 478 F.3d 224, 236 (4th Cir. 2007). And while exceptions to that general rule might apply in cases where double jeopardy is implicated or where there exists a pervasive pattern of serious prosecutorial misconduct, *see United States v. Borokinni*, 748 F.2d 236, 237–38

2

(4th Cir. 1984) (double jeopardy); *United States v. Derrick*, 163 F.3d 799, 809 (4th Cir. 1998) (prosecutorial misconduct), neither of those exceptions apply in Wilson's case. Regarding whether the former exception could apply, we foreclosed that possibility in Wilson's prior appeal where we determined that Wilson was not goaded into requesting a mistrial and therefore double jeopardy did not bar retrial. Order at 3, *United States v. Wilson*, No. 18-4882 (4th Cir. Mar. 6, 2019), ECF No. 24. Regarding the latter exception, we see no evidence of prosecutorial misconduct in the record before us, much less a "pattern of prosecutorial misconduct . . . so entrenched and pervasive that it would justify dismissal of [the] indictment[]." *Derrick*, 163 F.3d at 809.

Ultimately, Wilson suffered no prejudice from the Government's mistake. The inadvertently withheld materials were disclosed, the district court declared a mistrial, and Wilson had ample time to review the materials and make use of them in his defense in the second trial. The same is true here as it was in *Borokinni* where we said the defendant "was not harmed. He got a new trial. The second trial cured any errors in the government's nondisclosure of the materials at the first trial." *Borokinni*, 748 F.2d at 238. Accordingly, we affirm the district court's denial of Wilson's motion to dismiss the indictment against him.

## II.

We next turn to Wilson's challenges to the sufficiency of the evidence on each of his convictions. We review a challenge to the sufficiency of the evidence de novo but "view[] the evidence in the light most favorable to the prosecution[] and accord[] the benefit of all reasonable inferences to the government." *Evans-Smith v. Taylor*, 19 F.3d

3

899, 905 (4th Cir. 1994) (citation omitted). We reverse only if we conclude that no rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.* Wilson argues that the evidence was insufficient to convict on all but one count of conviction.

Wilson's twelve counts of conviction arise from his alleged years-long conspiracy to defraud the government by paying bribes and kickbacks for preferential treatment in the contract-bidding process and by charging the government for services that were never delivered. The evidence presented at trial showed that the conspiracy involved two telecommunications construction companies, PVS and MSO Tech, both founded and wholly owned by Wilson. One of MSO Tech and PVS's largest clients was Level 3 Communications. Dating back to 2010, Wilson paid kickbacks to Tim Donelson, who at the time oversaw the management of government contracts awarded to Level 3. Donelson would then award Wilson's companies lucrative subcontracts.

Eventually, the two men recruited another Level 3 employee, Ronald Capallia, and an official at the Department of Defense Office of the Inspector General, Matthew Kekoa LumHo. LumHo served as a Designated Agency Representative for the Washington Interagency Telecommunications Services ("WITS") contract, a large contract between his agency and the General Services Administration ("GSA"). With their help, Wilson and Donelson began fraudulently billing on the WITS contract. Each fraudulent bill had the same progression: LumHo would contract with Level 3 for expert technical services, Level 3 would subcontract with one of Wilson's companies to fill the orders, Wilson would obtain goods (not expert technical services) for Level 3, Wilson would upcharge Level 3 for the goods, and Level 3 would bill the GSA for far more than Wilson's out-of-pocket costs.

When it billed the GSA, Level 3 used billing codes for expert technical services even though MSO Tech had not provided such services. For example, for one of the fraudulent orders, Level 3 billed the GSA $153,767.02 for cable installation services, even though Wilson "fulfilled" that order by purchasing cable *equipment* at an out-of-pocket cost of $76,027.42. With this background, we turn to a review of the sufficiency of the evidence on each count of conviction that Wilson challenges.

Wilson's first count of conviction was for conspiracy to commit wire fraud. Conspiracy to commit wire fraud under 18 U.S.C. § 1349 requires a jury to find "that (1) two or more persons agreed to commit wire fraud and (2) the defendant willfully joined the conspiracy with the intent to further its unlawful purpose." *United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018).  A conviction for wire fraud under 18 U.S.C. §§ 1343 and 1346 requires a jury to find that the defendant "(1) devised or intended to devise a scheme to defraud and (2) used or caused the use of wire communications in furtherance of that scheme." *Id.* The term "scheme to defraud" includes "deprivations not only of money or property, but also of intangible rights." *Skilling v. United States*, 561 U.S. 358, 400 (2010). One such intangible right is the right to "honest services." *Id.* The public is deprived of its right to honest services when a public official is paid bribes in exchange for a certain action (such as awarding a particular contract), and an employer is deprived of its right to honest services when an employee is paid kickbacks in exchange for a certain action. *Id.* at 400–01, 407–09.

Wilson argues that the evidence was insufficient to convict him of conspiracy to commit wire fraud because no rational juror could have concluded that the numerous

5

payments he made to Donelson, Capallia, and LumHo were bribes or kickbacks as opposed to mere generosity or legitimate business payments. We disagree.

At trial, the Government presented evidence of the extensive nature of the payments made from Wilson to his coconspirators, payments that far exceeded the bounds of generosity between friends. And Wilson's characterization of his payments to Donelson as part of a legitimate business agreement—of which he produced no evidence—borders on absurd. We thus affirm Wilson's conviction for conspiracy to commit wire fraud.

Wilson was also convicted of three counts of wire fraud. The charged wires in two of these counts are emails that Wilson's coconspirator Capallia sent to Level 3's accounting department directing it to pay MSO Tech for the fulfillment of an order. The charged wire in the third count is a request for services Capallia submitted to Level 3 requesting that it issue an order for services to MSO Tech. All these wires involved orders for which Level 3 fraudulently billed the WITS contract in line with the scheme described above.

In arguing that the evidence was insufficient to convict him of wire fraud, Wilson argues that while Capallia's communications to Level 3 may have fraudulently requested payments to MSO Tech for services that it did not provide, Wilson never concealed in his communications with Capallia that MSO Tech was merely providing goods and not the services that the government had ordered. But this argument misses the mark. Wilson is no less culpable merely because he communicated the truth *to his coconspirator* in uncharged wires when the Government presented substantial evidence that Wilson knew Capallia would conceal the true nature of the transaction when he invoiced Level 3 and billed the

6

government in the charged wires. We thus affirm Wilson's convictions for wire fraud.

Wilson was also convicted of five counts of making or presenting false claims to a department or agency of the United States. To convict a defendant of false claims, a jury must find that "(1) the defendant knowingly made or presented a claim to any federal agency and (2) the defendant knew that such claim was false, fictitious, or fraudulent." *United States v. Whyte*, 918 F.3d 339, 350 n.12 (4th Cir. 2019). Each of these counts is based on a monthly invoice Level 3 submitted to the GSA seeking payment for fraudulent orders. MSO Tech was the subcontractor on each of these orders.

Wilson's argument that the evidence was insufficient to convict on the false-claims counts is essentially identical to the argument he makes regarding the wire-fraud convictions. He does not dispute that Level 3 billed the GSA for services that were never provided to the government. Instead, he argues that he accurately billed Level 3 for the goods MSO Tech provided and that he is therefore not culpable for Level 3's fraudulent billing. This argument fails for the same reason his wire-fraud argument fails: the Government put on substantial evidence that Wilson was fully aware of how Level 3 would bill GSA for the work done by MSO Tech. We thus affirm Wilson's convictions for false claims.

Wilson was convicted of one count of bribery of a public official for the various payments he made to LumHo. A person commits the offense of bribery of a public official if they "directly or indirectly, corruptly give[], offer[] or promise[] anything of value to any public official . . . with intent . . . to influence any official act." 18 U.S.C. § 201(b)(1)(A). Wilson argues that, at most, the evidence was sufficient to convict him of

7

paying LumHo an illegal gratuity, a lesser included offense of bribery. "Whether a payment is a bribe or an illegal gratuity under § 201 depends on the intent of the payor." *United States v. Jennings*, 160 F.3d 1006, 1013 (4th Cir. 1998). "Bribery requires intent 'to influence' an official act[,] . . . while illegal gratuity requires only that the gratuity be given or accepted 'for or because of' an official act. In other words, for bribery there must be a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999).

Wilson argues that there was insufficient evidence to show his intent to influence an official act because he was already the Level 3 subcontractor on the WITS contract and had already been issued purchase orders in some of the service requests at issue before he began paying LumHo.[1] But only one fraudulent order predated the payments to LumHo and thirteen came after. Viewing the evidence in the light most favorable to the Government, we conclude that a rational juror could find that Wilson made the payments to LumHo with the intent to influence the pattern of favorable conduct from LumHo that followed the initiation of the payments.

Wilson also argues briefly that because he was already a Level 3 subcontractor, there was "no value [to] whatever influence Wilson may have perceived that [LumHo] possessed." Opening Br. at 75. But this argument fails because, even if it was true that

---

[1] These payments were made in the form of paychecks from MSO Tech sent to LumHo's father-in-law, Fidel Ramos. But a rational juror could easily find that this method of payment was merely an attempt to cover up the true nature of the bribes. Ramos testified he had never worked for MSO Tech, and the checks were deposited into an account that LumHo helped Ramos—who testified that he is illiterate—open and to which LumHo had access.

LumHo had no ability to influence the contracting process, what matters is Wilson's perception that he did. *See Wilson v. United States*, 230 F.2d 521, 526 (4th Cir. 1956) (stating that it is "immaterial" that the recipient of a bribe "may not have had actual authority to carry out his commitments under the bribery scheme"). We thus affirm Wilson's conviction for bribery of a public official.

Wilson was also convicted for making a materially false statement in a matter within the jurisdiction of the executive branch pursuant to 18 U.S.C. § 1001(a). To sustain a conviction under § 1001(a), the Government must prove that (1) "the defendant made a false statement to a governmental agency or concealed a fact from it or used a false document knowing it to be false; (2) the defendant acted knowingly or willfully; and (3) the false statement or concealed fact or false document was material to a matter within the jurisdiction of the agency." *United States v. Barringer*, 25 F.4th 239, 250 (4th Cir. 2022) (quoting *United States v. Sarihifard*, 155 F.3d 301, 306 (4th Cir. 1998)).

This count of conviction is based on various statements Wilson made to government investigators when they interviewed him during their investigation of the WITS contract fraud. While Wilson concedes on appeal that some of the statements he made to the investigators were "not accurate," he argues that there was insufficient evidence to sustain his conviction because the inaccurate statements were immaterial. Opening Br. at 77.

"A statement is material if it has a natural tendency to influence, or is capable of influencing, the decision-making body to which it was addressed." *United States v. Smith*, 54 F.4th 755, 769 (4th Cir. 2022) (per curiam) (quoting *Sarihifard*, 155 F.3d at 306). Wilson argues that the agent to whom he made the false statement "testified that [the

9

statements] did not impact the investigation." Opening Br. at 77. That is a mischaracterization of the agent's testimony—the agent testified that he would have *continued* investigating Wilson regardless of Wilson's answers in the interview, not that his answers had no impact on the investigation. J.A. 4042–43.[2] However, even if the agent *had* said or implied that Wilson's answers did not affect the investigation, the test of materiality is an objective one; it is "irrelevant 'whether the false statement *actually influenced* the [agency's] decision-making process.'" *Smith*, 54 F.4th at 769 (quoting *United States v. Hamilton*, 699 F.3d 356, 362 (4th Cir. 2012)).

Materiality is a "low bar." *United States v. Legins*, 34 F.4th 304, 318 n.17 (4th Cir. 2022). A statement that is aimed at misdirecting a government agent satisfies the materiality requirement of § 1001 even if it was *unlikely* that the statements would misdirect the agents, so long as it has a "natural tendency" to do so or is "capable" of doing so. *Smith*, 54 F.4th at 769, 772 (quoting *Sarihifard*, 155 F.3d at 306); *see also Brogan v. United States*, 522 U.S. 398, 402 (1998) (holding that materiality does not "turn upon the credulousness of the federal investigator").

Here, Wilson's statements to investigators characterized his payments to Capallia and Donelson as either friendly generosity or payments as part of a business agreement, and thus are misrepresentations that "could cause [the investigators] to re-direct their investigation to another suspect, question their informant differently or more fully, or perhaps close the investigation altogether." *Smith*, 54 F.4th at 769. We thus conclude that

---

[2] Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.

10

Wilson's untruthful statements were material and affirm Wilson's conviction for false statements.

## III.

Having concluded that there was sufficient evidence to convict Wilson on each challenged count of conviction, we turn to his challenge to the district court's response to a set of questions from the jury. While deliberating, the jury sent the following set of questions to the district court: "Could we get the exhibit number for Count 2 of the indictment? Could we get the exhibit number for Count 3 that corresponds to service order 6129? Could we get the exhibit number for Count 4 that corresponds to service order 6192?" J.A. 7132. Over Wilson's objection, the district court responded: "The exhibit number for Count 2 is Government 189. The exhibit number for Count 3 is Government 190. The exhibit number for Count 4 is Government 191. You should continue to review all of the evidence before you and consider the jury instructions collectively in your deliberations." J.A. 7133. Wilson argues that the district court's direction of the jury's attention to particular exhibits that correspond to particular counts impermissibly impinged on the role of the jury as the sole factfinder.

We review a district court's response to a jury's question for abuse of discretion. *United States v. Burgess*, 684 F.3d 445, 453 (4th Cir. 2012). In answering a jury's question, the court must "respond[] to the apparent source of confusion accurately, without creating prejudice." *Id.*

The Supreme Court has recognized that a district court judge is more than a "mere moderator" and has substantial discretion in overseeing a trial. *Quercia v. United States*,

11

289 U.S. 466, 469 (1933). And the Supreme Court has specifically stated that a trial judge may "explain[] and comment[] upon the evidence" and "draw[] [the jury's] attention to the parts of [the evidence] which he thinks important." *Id.* But a trial judge's discretion is not unlimited, and the Supreme Court has also recognized that the trial judge's influence on the jury is "of great weight." *Id.* at 470. A trial judge must not "usurp[] the jury's factfinding role" by answering a question in such a way that has the "effect of mandating that the jury reach a conclusion on a particular issue." *United States v. Rivera-Santiago*, 107 F.3d 960, 965 (1st Cir. 1997).

Here, the jury was given thousands of pages of exhibits to parse. Thus, its question to the district court is best read as expressing its need for help locating particular exhibits among that vast quantity of evidence, and the district court's response is best interpreted as merely providing that assistance. But, even if the district court did err in directing the jurors' attention to particular exhibits, any error was harmless in light of the overwhelming evidence of Wilson's guilt. *See Chapman v. California*, 386 U.S. 18, 23–24 (1967) (even constitutional errors are harmless where they do not contribute to the defendant's conviction). We thus decline to disturb Wilson's convictions based on the district court's answer.

IV.

Finally, Wilson challenges the district court's application of three sentencing enhancements: (1) a two-level enhancement for an offense that involved more than one bribe; (2) a four-level enhancement for being a leader or organizer of the offense; and (3) a four-level enhancement because the offense involved a public official in a high-level

12

decision-making or sensitive position. In assessing the application of a Guidelines enhancement, the court reviews "findings of fact for clear error and legal decisions de novo." *United States v. Chandia*, 675 F.3d 329, 337 (4th Cir. 2012) (quoting *United States v. Rooks*, 596 F.3d 204, 210 (4th Cir. 2010)). We address each enhancement in turn.

First, Wilson appeals the district court's application of a sentencing enhancement for an offense that involved more than one bribe. Wilson's challenge to this enhancement is premised entirely on his argument that there was insufficient evidence to sustain his conviction for bribery of a public official. Because we have already concluded that the Government presented sufficient evidence that Wilson bribed LumHo, we similarly reject Wilson's argument that this enhancement was erroneously applied.

We move next to Wilson's challenge to the district court's application of a sentencing enhancement based on Wilson's role in the offense. Section 3B1.1 of the Sentencing Guidelines instructs a district court to increase a defendant's base offense level by four "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1. Because a "district court's determination that a defendant held a leadership role in criminal activity is 'essentially factual,'" we review the determination for clear error. *United States v. Steffen*, 741 F.3d 411, 414 (4th Cir. 2013) (quoting *United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir. 1990)).

Here, the district court did not clearly err in finding that Wilson was an organizer or a leader in the offense—Wilson orchestrated the bribes, attempted to orchestrate a cover-up, and kept a much larger share of the profits than the other members of the conspiracy.

13

Thus, Wilson was a leader within the meaning of the Guidelines. *See* U.S.S.G. § 3B1.1 cmt. 4 (listing factors courts should consider in applying the enhancement). We therefore conclude that the court properly applied the enhancement for Wilson's role in the offense.

Finally, we turn to the district court's application of a sentencing enhancement based on the offense involving a public official in a high-level decision-making role. Section 2C1.1 of the Sentencing Guidelines instructs a district court to increase a defendant's base offense level by four levels "[i]f the offense involved an elected public official or any public official in a high-level decision-making or sensitive position." U.S.S.G. § 2C1.1(b)(3).

The district court applied this enhancement because of LumHo's role in the conspiracy as the Department of Defense Office of the Inspector General's Designated Agency Representative for the WITS contract. Wilson argues the enhancement is inapplicable because Wilson's role in the offense was too attenuated from LumHo for the court to have concluded that his offense involved a public official in a high-level decision-making position. We disagree. While Wilson correctly points out that LumHo awarded work to Level 3 rather than directly to Wilson's company MSO Tech, LumHo did so with the knowledge that Level 3 would then award subcontracts to MSO Tech.

And, to the extent Wilson argues that LumHo is not a public official in a high-level decision-making position within the meaning of the enhancement, that argument fails as well. During the conspiracy, LumHo served as a Designated Agency Representative for the contract. The Government presented evidence that he had significant discretion in choosing contractors to which he would award projects under the WITS contract. This is

14

significantly more autonomy and discretion than that of a public official in another case, *United States v. Matzkin*, 14 F.3d 1014 (4th Cir. 1994), in which we applied the enhancement. In that case, the government official involved in the offense did "not make the final decision that the contracts should be awarded to a particular bidder," as LumHo did here. *Matzkin*, 14 F.3d at 1021. Instead, in *Matzkin*, it was enough that the official was a member of a three-person panel who merely *recommended* certain bids for selection to other government officials. *Id.* Thus, LumHo fits squarely within the enhancement's definition and the enhancement was properly applied.

V.

Accordingly, we affirm Wilson's conviction and sentence. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

*AFFIRMED*

15